472 N.W.2d 254 (1991)
STATE of Iowa, ex rel. Thomas J. MILLER, Attorney General of Iowa, Appellant,
v.
Fahim RAHMANI, et al., Defendants,
D. Jack Smith, Jr., d/b/a The Law Firm of D. Jack Smith, Jr., Appellee.
No. 90-470.
Supreme Court of Iowa.
June 19, 1991.
*255 Bonnie J. Campbell, Atty. Gen., and Ray Johnson, Asst. Atty. Gen., for appellant.
Joseph A. Happe and James C. Huber of Jones, Hoffmann & Huber, Des Moines, for appellee.
Considered by McGIVERIN, C.J., and CARTER, LAVORATO, SNELL, and ANDREASEN, JJ.
ANDREASEN, Justice.
The State appeals from the district court's finding that the State failed to prove by clear, satisfactory and convincing evidence that the conduct of D. Jack Smith, Jr. amounted to a deceptive act or an unfair practice under the Iowa Consumer Fraud Act. Iowa Code ch. 714.16 (1985). We affirm.

I. Background.

This action was brought by the State against Fahim Rahmani, several of his corporations, William Jordan and D. Jack Smith, Jr. Prior to trial, the State settled with all defendants except Smith. The petition was filed in response to several schemes run by Rahmani in violation of the Iowa Consumer Fraud Act. Iowa Code § 714.16.
There were three different schemes in all: Federal Home Enterprise, Inc. (FHE), Vacation America, Inc. (Vacation America), and R & A Enterprise (R & A), later renamed Resource Access Enterprise. Rahmani operated these schemes from an office in Ames, Iowa.
Smith is a Tennessee attorney who specializes in multi-level marketing law. He first became involved with Rahmani when Rahmani visited his office in Memphis about FHE. FHE had been in place for nearly two years by this time. It was a scheme in which a twenty-seven page photocopied booklet entitled "Reference Guide to Mail Order Business" was offered for sale for thirty-five dollars. Rahmani had paid thirty-six dollars for the nonexclusive right to reproduce the booklet.
In March 1986, Rahmani, under investigation by the United States Postal Service, sought out Smith for advice regarding FHE. Smith testified that although he may have suggested certain changes in the program, he refused to accept FHE as a client at that point because he felt it had too many problems. Because Rahmani indicated that FHE was being phased out, and because Rahmani said he wanted Smith's help in starting a new program, they entered into a retainer agreement in which Rahmani paid Smith $250 per month. We agree with the district court that this arrangement was a true retainer and not a fee for the use of Smith's name as Rahmani claimed at trial.
*256 Rahmani continued to mail out brochures promoting FHE and began using Smith's name in the brochures. These brochures were mailed out with inserts which stated:

IS IT LEGAL?
Yes! In structuring this program, we have paid close attention to Postal, FTC and Atorney Generals' (sic) Regulations. We have retained Mr. D. Jack Smith, a highly-qualified multi-level Attorney, to ensure our compliance with State and Federal regulations. With over three years in business, we are here to stay and our Attorney will ensure the security of our distributors.
It is clear from the record that FHE in fact was illegal.
While Rahmani claimed at trial that Smith knew all along that his name was being used in this manner, Smith emphatically denied that he authorized the use of his name for the promotion of FHE and said he was not even aware of it until much later. The trial court found Smith to be the more credible witness. In an equity case such as this, we give weight to the fact findings of the trial court, especially when considering the credibility of witnesses, but we are not bound by them. Iowa R.App.P. 14(f)(7).
In April 1986, Rahmani again traveled to Memphis to consult with Smith about his new program called Vacation America. The product being offered under this program was supposedly a vacation. However, airline tickets were essentially all Rahmani ever intended to deliver. Smith assisted Rahmani in drafting the promotional materials for the program. He also registered the program in the six states that require registration.
In October 1986, Smith mailed to the attorneys general of all fifty states a letter introducing Vacation America and requesting that they direct any inquiries or concerns to his office. Enclosed in the letter was a copy of Rahmani's brochure which had been printed up. Smith testified that he was not happy with some portions of the brochure. He testified, however, that since Rahmani had gone to the expense of printing it, he felt it was good enough for the purpose of submitting it to the attorneys general in order to gain their input. Although Smith never authorized the mailing of this version of the brochure to consumers, Rahmani began mailing it out immediately.
This version of the brochure contained the "Is it Legal? Yes!" language which Rahmani had also inserted into the FHE brochure. The Vacation America brochure also contained numerous false and deceptive statements.
In the fall of 1986, both FHE and Vacation America came under investigation by the postal authorities. Rahmani's mail was held, and Smith represented him in an effort to get the mail released. Smith met with a postal official in Chicago and went over the brochures line-by-line. Several changes were made and the mail was eventually released. The "Is it legal? Yes!" paragraph in the Vacation America brochure was changed to read as follows:
LEGALITIES. We have retained Mr. D. Jack Smith, a highly qualified, multi-level attorney, in an effort to ensure our compliance with State and Federal regulations.
We find that this was the first authorized use of Smith's name.
Vacation America ultimately failed. Fewer than five people, if any, ever received an airline ticket through the program.
In the spring or summer of 1987, Rahmani began the scheme known as R & A Enterprise. R & A was touted as an "interest free loan program." The "loans" did not have to be repaid. In effect, R & A was nothing but a chain letter. Smith testified that he was not involved in the development of R & A, that he did not like it, and that he did not take it on as a client or authorize Rahmani to use his name in promoting it. Smith testified that while he may have given Rahmani some advice over the telephone, in general he tried to stay away from R & A. He also told Rahmani he should get out of it.
*257 Not surprisingly, R & A soon ran afoul of the postal authorities. In an effort to keep R & A in business, Rahmani asked Smith to meet with post office officials to bring the R & A promotional literature into compliance with the postal laws so that Rahmani's mail could be released. In August 1987, Smith met in Ames with a postal official to go over the R & A literature. The materials proved to be unsalvageable, however, and the next day the post office filed a temporary restraining order in federal court.
Some modifications to the R & A literature were drafted in the course of Smith's negotiations with the post office, including the addition of the "legalities" language used in the Vacation America brochures. Smith never authorized the mailing of these revised materials to consumers because of the impasse reached in his negotiations with the post office. There was some evidence offered at trial that Rahmani mailed out the modified materials anyway. We find, however, that Smith had nothing to do with the mailing of these materials.
While Smith was in Ames in August 1987, Rahmani told him of his most recent brainstorm which was simply to rename R & A as Resource Access Enterprise and forge ahead. Smith testified that he was "furious" with Rahmani for undermining Smith's good-faith negotiations with postal officials. Smith testified he was fearful that Rahmani's "transparent, patent attempt... to run around end ..." would jeopardize Smith's credibility with postal officials.
While the brochure for Resource Access contained the "legalities" statement of earlier brochures, Smith did not authorize the use of his name, nor was he connected at all with Resource Access. Resource Access lasted from seven to ten days before the post office shut it down.
About the time of the August 1987 postal investigation, the Iowa Attorney General's office also began investigating Rahmani's operations. Rahmani subsequently terminated all the schemes discussed above, and this action followed.

II. Scope of Review and Burden of Proof.

Our review of this equity action is de novo. State ex rel. Miller v. Hydro Mag, Ltd., 436 N.W.2d 617, 619 (Iowa 1989). The State has the burden of establishing each of the necessary elements by a preponderance of clear, convincing, and satisfactory evidence. Id. The State urges us to ease this burden to simply a preponderance of the evidence. We decline to do so.
The general presumption in Iowa is that in civil cases the burden of proof is a preponderance of the evidence. Iowa R.App.P. 14(f)(6). However, an exception to this rule has long been recognized in the area of civil fraud. In fraud cases, the plaintiff must prove his case by a preponderance of clear, satisfactory, and convincing evidence. See, e.g., id.; Robinson v. Perpetual Serv. Corp., 412 N.W.2d 562, 565 (Iowa 1987); Steffy v. Schultz, 215 Iowa 837, 839-40, 246 N.W. 910, 911 (1933). This burden is higher than the typical preponderance of the evidence standard and less than the beyond a reasonable doubt standard. Mills County State Bank v. Fisher, 282 N.W.2d 712, 716 (Iowa 1979). The burden of proof in fraud cases is qualitatively, rather than quantitatively, distinguishable from a mere preponderance of the evidence. Id.
In Hydro Mag, although we held the legislature had reduced the number of elements of fraud to be proved under section 714.16, we nevertheless retained the traditional burden of proof in the absence of any stated legislative intent to alter it. Hydro Mag, 436 N.W.2d 617, 619 (Iowa 1989). When the supreme court has interpreted a statute and thereafter the legislature leaves the statute unchanged, we presume the legislature has acquiesced in that interpretation. See Pearson v. Robinson, 318 N.W.2d 188, 191 (Iowa 1982) and cases cited. We decline to alter the burden of proof.

III. Material Misrepresentation and Deception.

The State urges that Smith made several statements in the program brochures that *258 were materially false and deceptive. The State urges that one need not have an ownership interest in an illegal scheme in order to violate deceptive trade practices laws such as Iowa Code section 714.16. Doherty, Clifford, Steers & Shenfield, Inc. v. FTC, 392 F.2d 921, 928-29 (6th Cir.1968).
However, before a person can be found liable for making materially false or deceptive representations, that person must make some sort of representation. Here, Smith did not mail any literature to consumers; he was not active in the promotion or management of any of the programs, and his compensation was in no way tied to the performance of the programs. Smith merely drafted changes and suggested them to Rahmani. Rahmani adopted some of the changes and rejected others. We are not entirely convinced that when an attorney drafts language on behalf of a client, the attorney has made a "representation" for purposes of section 714.16. Generally, when a lawyer drafts language on behalf of a client, the representations are attributed to the client. We need not decide this issue, however, because we find the statement of which the State complains was neither false nor deceptive.
In Hydro Mag, 436 N.W.2d at 622, we listed six factors which we considered in determining whether various claims of a product's performance were material misrepresentations. The district court in this case applied the six factors in determining whether Smith had made any material misrepresentations.
As the State points out in its brief, the six factors are most commonly used to determine whether there is a reasonable basis for an express or implied claim in an advertisement. The factors are tailored to a situation in which it is alleged that claims regarding a product's performance are unsubstantiated. However, since the issue in Hydro Mag was whether certain claims of a water treatment device's performance were material misrepresentations, we found the factors to be useful. However, the factors are not necessarily applicable in all cases. For general purposes, under section 714.16, a material misrepresentation is any untruthful statement which is likely to affect a consumer's conduct or decision with regard to a product or service. See D. Prigden, Consumer Protection and the Law § 10.05[2], at 10-18 (1990). This is the test we apply in this case.
As a factual matter, we have found that Smith did not authorize the use of his name in the FHE materials; nor did he authorize the mailing of the R & A and Resource Access brochures. We find that Smith made no representations to consumers regarding those programs.
The only representations which could conceivably be attributed to Smith are the changes he drafted for inclusion in the second version of the Vacation America brochure. Specifically, the State alleges that the "Legalities" language was both a material misrepresentation and deceptive. The State urges the statement is false because there was no "effort to ensure ... compliance with State and Federal regulations." However, we find that Smith did take steps to bring Vacation America into conformance with various laws. He registered the program in the six states where registration is required. Smith also drafted several changes at the request of the offices of several attorneys general. We agree with the district court's finding that the "Legalities" language is not a material misrepresentation.
The State also urges that the statement, even if not false, was nevertheless deceptive. Deception is "an act or practice which has the tendency or capacity to mislead a substantial number of consumers as to a material fact or facts." Iowa Code § 714.16(1)(g). Thus, a statement which is literally true may nonetheless be deceptive. Here, we are not persuaded that the "Legalities" statement was deceptive. The statement said merely that an effort to comply with the law was being made. Without asserting that the program was legal, this language alerted consumers to the fact that there were potential legal problems involved with the program. The *259 State failed to prove by a preponderance of clear, satisfactory, and convincing evidence that the "Legalities" language was deceptive.

IV. Furnishing the Means to Deceive Others.

The State claims that Smith furnished Rahmani with the means to deceive others when he successfully met with postal officials in the fall of 1986 regarding the holding of Rahmani's mail. In its brief, the State claims the "only ethical course of action" was to "instruct Rahmani to allow postal to return the orders."
The American Bar Association's Code of Professional Responsibility states: "A lawyer shall not intentionally: (1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules...." DR 7-101(A)(1). Smith's client, Rahmani, wanted his mail released by the post office. This was apparently a legal objective under postal regulations. Smith had an ethical duty to his client to zealously represent him in an effort to accomplish that objective. Obviously, an attorney may not "[c]ounsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." DR 7-102(A)(7). However, protecting a client's rights under the postal regulations, thereby getting his mail released, does not make a lawyer responsible for what the client subsequently does with that mail. We conclude that Smith did not furnish Rahmani with the means to deceive others in violation of Iowa Code section 714.16(2)(a).
All other issues raised have been considered and we find them without merit or unnecessary to discuss. We affirm the district court judgment.
AFFIRMED.