**STATE of Iowa ex rel. Craig A. GOETTSCH, Appellant,**

v.

**DIACIDE DISTRIBUTORS, INC., Kathleen M. Starnes, Larry E. Kellogg, Bruce E. Nelson, Richard C. Johnson, J.R. Grady, Herman Tripp, and White Mountain of America, Inc. a/k/a White Mountain Natural Products, Inc., Defendants,**

and

**Sam McHose, Appellee.**

No. 95–1006.

Supreme Court of Iowa.

March 26, 1997.

Rehearing Denied April 18, 1997.

Thomas J. Miller, Attorney General, and Anuradha Vaitheswaran, Assistant Attorney General, for Appellant.

J. Russell Hixson of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for Appellee.

Considered by LARSON, P.J., and CARTER, LAVORATO, SNELL, and TERNUS, JJ.

LAVORATO, Justice.

This securities fraud case brought by the State pursuant to Iowa Code chapter 502 (1993) raises several questions. First, what is the appropriate standard of proof for actions brought under chapter 502? Second, can the State use aiding and abetting to establish secondary liability for securities fraud under chapter 502? Third, can the State seek remedies against an alleged aider and abettor under the State's enforcement provisions in Iowa Code section 502.604(2)? Last, was the evidence sufficient to establish that the defendant, Sam McHose, aided and abetted securities fraud?

We hold that preponderance of the evidence is the appropriate standard of proof for chapter 502 actions. We answer the remaining questions in the affirmative. In doing so, we reverse the district court's finding that the State failed to prove McHose aided and abetted securities fraud. We remand for further proceedings to allow the district court to grant appropriate relief consistent with this opinion.

I. *Background Facts.*

In 1988 Kathleen Starnes and her brother, Joseph Grady, incorporated Diacide Distributors, Inc. to promote, sell, and distribute certain products. Starnes was president and Grady was vice-president. They were the sole owners of the corporation.

White Mountain of America, a Grinnell-based corporation, manufactured and packaged an environmentally-friendly insecticide that Diacide promoted and sold. Diacide was in need of financing to market the insecticide and to purchase it from White Mountain.

In late 1988 Starnes and Herman Tripp, an owner of White Mountain, approached Sam McHose, a retired banker from Nevada, Iowa, to obtain the initial financing. McHose agreed to provide this initial financing.

On November 13, 1989, McHose, through his family-held corporation, E.S.P. & S., Inc. (ESP), entered into a written agreement with White Mountain to purchase 4000 cans of the insecticide at $4 per can. White Mountain and Starnes agreed to re-purchase the insecticide from ESP at a price of $5.50 per can. Tripp conceived the terms of the agreement, and Starnes executed it as director of marketing for White Mountain.

On May 15, 1990, Diacide entered into a distribution agreement with White Mountain for the purchase and distribution of the insecticide.

In September 1990 Diacide entered into a financing agreement with ESP. In the latter part of 1990 and early part of 1991, ESP loaned money to Diacide for inventory, marketing expenses, and operating expenses. Diacide agreed to repay these loans within sixty to 120 days at 16.66% interest. As of December 1991, Diacide allegedly owed ESP and McHose $102,283 on these loans.

In early 1992 Starnes began gearing up to raise additional capital allegedly to keep Diacide going. To this end she recruited three

licensed insurance agents to sell ninety-day-marketing-inventory receipts and ninety-day-contract notes (Diacide notes). This sales crew included Richard Johnson, Bruce Nelson, and Larry Kellogg. To induce investors to purchase the notes, Starnes had her attorney prepare a promotional document known as the Diacide Information Guide (Guide).

The Guide described the pesticide and the need for Diacide to obtain funds to purchase tons of the insecticide. The Guide promised investors 12.5 to 16.66% interest on their money every ninety days. In the notes, Diacide and Starnes guaranteed investors the return of their invested principal and the promised interest. Some of the notes and the Guide also represented that the insecticide had been presold to customers, who would pay within ninety days. The presold insecticide was to serve as collateral for the Diacide notes.

The Guide also contained financial statements grossly inflating the net worth and profits of Diacide. Grady prepared these financial statements.

McHose also tried to market Diacide insecticide and he was to receive a percentage of Diacide's net income in return for his marketing efforts. In 1993 McHose agreed to use the ESP bank account to receive and disburse Diacide funds. He also opened a separate account known as the J.R. Grady Distributing, Inc. account to receive and disburse such funds. McHose used investor money derived from the sale of Diacide notes to pay himself and others involved with Diacide, as well as relatives or associates, and to make interest payments to early investors.

From the early part of 1992 through 1994, Starnes and her sales crew sold Diacide notes to more than seventy investors, mostly elderly people. Sixty-five of those investors lost over $1.4 million. Very little of the money, if any, was ever used to purchase the insecticide.

We relate additional facts in our discussion of the issues raised on appeal.

## II. *Background Proceedings.*

The State of Iowa through Craig A. Goettsch, Iowa superintendent of securities, sued Diacide, White Mountain, Tripp, Starnes, Grady, Kellogg, Nelson, Johnson, and McHose. The petition alleged that the defendants violated various provisions of the Iowa Uniform Securities Act and sought numerous items of relief against the defendants. Among other things, the State sought, on behalf of the investors, restitution and disgorgement of profits against all the defendants. *See* Iowa Code § 502.604(2) (authorizing various forms of relief, including restitution and disgorgement of profits).

Specifically, as to McHose, the State alleged that, among other things, he aided and abetted securities fraud. For reasons not clear in the record, White Mountain and Tripp were out of this lawsuit by the time the case came to trial. During a bench trial, the State reached settlements with Kellogg, Nelson, and Johnson. Following the trial, the district court found that Diacide, Starnes, and Grady had committed numerous securities violations including securities fraud. The court, however, dismissed the claims against McHose, finding there was insufficient evidence to support them.

The State appealed and McHose cross-appealed. None of the other defendants appealed.

We consider the following issues:

1. What is the appropriate standard of proof for Iowa Code chapter 502 actions?

2. Can the State use aiding and abetting to establish secondary liability for violations of the antifraud provisions of Iowa Code section 502.401?

3. Can the State seek remedies against aiders and abettors under Iowa Code section 502.604(2)?

4. Was the evidence sufficient to show that McHose aided and abetted the commission of securities fraud?

## III. *Scope of Review.*

Ordinarily we hear cases on appeal in the manner in which they were tried in the district court. *Davis–Eisenhart Mktg. Co. v. Baysden,* 539 N.W.2d 140, 142 (Iowa 1995). The case was tried as an equity case. Our review is therefore de novo. *Sun Valley*

*Iowa Lake Ass'n v. Anderson,* 551 N.W.2d 621, 629 (Iowa 1996). We give respectful consideration to the district court's fact findings, especially when witness credibility is an issue, but we are not bound by those findings. Iowa R.App.P. 14(f)(7).

### IV. *What is the Appropriate Standard of Proof for Iowa Code Chapter 502 Actions?*

The State contends the correct standard of proof under Iowa Code chapter 502 is a preponderance of the evidence. Although the district court concluded the correct standard is a preponderance of clear, satisfactory, and convincing evidence, the court found the State had failed to prove its case against McHose under either standard.

We have never addressed which standard of proof is appropriate for securities fraud under chapter 502. Before we decide whether the State proved McHose aided and abetted securities fraud, we need to set forth which standard applies.

On this question, the district court found *State ex rel. Miller v. Rahmani,* 472 N.W.2d 254 (Iowa 1991) convincing. In *Rahmani,* we decided that a preponderance of clear, satisfactory, and convincing evidence was called for in deciding claims under the Iowa Consumer Fraud Act. *See* Iowa Code § 714.16 (1985). In doing so we said:

> The general presumption in Iowa is that in civil cases the burden of proof is a preponderance of the evidence. However, an exception to this rule has long been recognized in the area of civil fraud. In fraud cases, the plaintiff must prove his case by a preponderance of clear, satisfactory, and convincing evidence. This burden is higher than the typical preponderance of the evidence standard and less than the beyond a reasonable doubt standard. The burden of proof in fraud cases is qualitatively, rather than quantitatively, distinguishable from a mere preponderance of the evidence.

*Rahmani,* 472 N.W.2d at 257 (citations omitted).

Our securities statute is modeled somewhat after the Securities Exchange Act of 1934. *State v. Tyler,* 512 N.W.2d 552, 556 (Iowa 1994). Therefore, cases interpreting the 1934 Securities Exchange Act are persuasive. *Id.*

Section 10(b) of the 1934 Securities Exchange Act prohibits fraudulent misrepresentations and omissions in connection with the sale of securities. The Supreme Court has held that the standard of proof for civil actions under § 10(b) is a preponderance of the evidence. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390–91, 103 S.Ct. 683, 692, 74 L.Ed.2d 548, 561 (1983). In *Herman & MacLean,* the Supreme Court noted that

> [r]eferences to common law practices can be misleading ... since the historical considerations underlying the imposition of a higher standard of proof have questionable pertinence here. Moreover, the antifraud provisions of the securities laws are not coextensive with common law doctrines of fraud. Indeed, an important purpose of the federal securities statutes was to rectify perceived deficiencies in the available common law protections by establishing higher standards of conduct in the securities industry. We therefore find references to the common law in this instance unavailing.

*Id.* at 388–89, 103 S.Ct. at 690–91, 74 L.Ed.2d at 559–60 (citations omitted).

The Supreme Court recognized that a standard of proof allocates the risk of error between the litigants and indicates the importance attached to the ultimate decision. *Id.* at 389, 103 S.Ct. at 691, 74 L.Ed.2d at 560. In the case of securities fraud, the Court decided that plaintiffs and defendants should be on equal footing:

> A preponderance-of-the-evidence standard allows both parties to "share the risk of error in roughly equal fashion." Any other standard expresses a preference for one side's interest. The balance of interests in this case warrants use of the preponderance standard. On the one hand, the defendants face the risk of opprobrium that may result from a finding of fraudulent conduct, but this risk is identical to that in an action under Section 17(a) [of the 1933 Securities Act], which is governed by the preponderance-of-the-evidence stan-

dard.... On the other hand, the interests of plaintiffs in such suits are significant. Defrauded investors are among the very individuals Congress sought to protect in the securities law. If they prove that it is more likely than not that they were defrauded, they should recover.

*Id.* at 390, 103 S.Ct. at 691–92, 74 L.Ed.2d at 560–61 (citations omitted).

■ The foregoing reasoning applies with equal force to our own securities law found in chapter 502. Iowa Code section 502.611 expressly directs us "to co-ordinate the interpretation and administration of [chapter 502] with the related federal regulation." Section 502.611 also allows us to construe and implement chapter 502 "to effectuate its general purpose to protect investors." By adopting the preponderance-of-the-evidence standard, we are complying with these statutory directives. We therefore adopt the preponderance-of-the-evidence standard in all chapter 502 civil actions.

V. *Can the State Use Aiding and Abetting to Establish Secondary Liability for Violations of the Antifraud Provisions of Iowa Code Section 502.401?*

The State alleged that McHose aided and abetted the violation of securities fraud as defined in Iowa Code section 502.401. In his answer McHose asserted that chapter 502 prohibits the State from using aiding and abetting to establish secondary liability for securities fraud violations.

As McHose points out, the district court concluded the State had failed to prove McHose aided and abetted the violation of securities fraud as defined in section 502.401. The court therefore did not address the issue McHose raised in his answer and now raises here.

A. *Aiding and abetting securities violations.* "Aiding and abetting is 'a method by which courts create secondary liability' in persons other than the violator of the statute." *Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164, 184, 114 S.Ct. 1439, 1452, 128 L.Ed.2d 119, 137 (1994) (quoting *Pinter v. Dahl,* 486 U.S. 622, 648 n. 24, 108 S.Ct. 2063, 2079 n. 24, 100 L.Ed.2d 658, 683

n. 24 (1988)). In *Central Bank,* the Supreme Court refused to extend private civil liability under § 10(b) of the Securities Exchange Act of 1934 to parties who merely aid and abet manipulative or deceptive practices. *Id.* at 191, 114 S.Ct. at 1455, 128 L.Ed.2d at 141. The court refused to do so "[b]ecause the text of § 10(b) does not prohibit aiding and abetting." *Id.*

Section 10(b) is the general antifraud provision of the 1934 Securities Exchange Act and provides in part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe.

15 U.S.C. § 78j (1996).

In 1942, the Securities and Exchange Commission adopted rule 10b–5 pursuant to § 10(b). Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1996).

■ Our securities law has an antifraud provision that has language similar to the

language in rule 10b–5. *See* Iowa Code § 502.401. Section 502.401 provides:

> It is unlawful for any person, in connection with the offer to sell, offer to purchase, sale or purchase of any security in this state, directly or indirectly:
>
> 1. To employ any device, scheme, or artifice to defraud;
>
> 2. To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> 3. To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Similar to § 10(b) and rule 10b–5, section 502.401 does not expressly provide for secondary liability through aiding and abetting. Iowa Code section 502.503 does, however, have an aiding and abetting provision. Section 502.503 provides in part:

> 1. Affiliates of a person liable under either section 502.501 [sellers of unregistered securities] or 502.502 [sellers of registered and unregistered securities who sell in violation of antifraud provisions of section 502.401], partners, principal executive officers or directors of such person, persons occupying a similar status or performing similar functions for such person, *persons (whether employees of such person or otherwise) who materially aid and abet in the act or transaction constituting the violation,* and broker-dealers or agents who materially aid and abet in the act or transaction constituting the violation, *are also liable jointly and severally with and to the same extent as such person, unless:*
>
> . . . .
>
> *b.* With respect to section 502.502 [fraudulent practices], subsection[ ] 2 [seller of unregistered securities in violation of antifraud provisions of section 502.401] . . ., any person liable hereunder proves that the person did not know, and was not grossly negligent in failing to know, of the existence of the facts by reason of which the liability is alleged to exist.

(Emphasis added.)

B. *"Person" or "affiliate" status.* McHose claims he was neither an affiliate of any of the defendants liable under sections 502.501 or 502.502 nor a partner, principal executive officer or director of any such defendants.

McHose ignores the following broad language in section 502.503(1):

> [P]ersons (whether employees of [a person liable under either section 502.501 or 502.502] or otherwise) who materially aid and abet in the act or transaction constituting the violation . . . are . . . also liable jointly and severally with and to the same extent as [persons liable under either section 502.501 or 502.502.]

We agree with the State that such language is broad enough to include persons who are not affiliates of primary violators nor partners, principal executive officers or directors of such violators. Thus, section 502.503(1) imposes secondary liability on *any* person who "materially aid[s] and abet[s] in the act or transaction constituting" the securities fraud defined in section 502.401.

C. *Standing and "purchaser" status.* McHose also contends the State has no authority and therefore no standing to invoke the aiding and abetting provisions of section 502.503(1) against him. In support of his contention, McHose argues that the antifraud provisions make sellers liable only to *purchasers,* and the State is not a purchaser. *See* Iowa Code § 502.502(2) (any person who offers or sells a security in violation of section 502.401 "shall be liable to the purchaser").

■ We agree with the State that the aiding and abetting provisions of section 502.503(1) do not limit standing to purchasers.

When standing is put in issue, the question is whether the person—the State here—whose standing is challenged is a proper party to request an adjudication of the issue. 59 Am.Jur.2d *Parties* § 30, at 416 (1987). McHose's argument that the State lacked standing to proceed against aiders and abet-

tors fundamentally misconstrues the statutory scheme of chapter 502. "Purchaser" status, as listed in section 502.502, goes only to the requirements for a private suit involving fraudulent practices in the offer, sale, and purchase of securities. The requirements for a private party to maintain an action and the requirements for State action must not be confused under a clear legislative mandate. After all, the State is suing on behalf and for the benefit of defrauded purchasers. The State must therefore have the benefit of any theory of liability available to individual purchasers suing in their own names in the absence of any contrary legislative intent.

In an analogous case at the federal level, the court held that defrauded purchaser or seller status was not required for the Securities and Exchange Commission to seek enforcement of rule 10b–5 and § 10(b) of the Securities Exchange Act. *SEC v. Wong*, 252 F.Supp. 608 (D.P.R.1966). In so holding, the court said:

> This is the case of a public agency enforcing public policy. The [Securities and Exchange Commission] does not have to engage in the purchase or sale of securities. In order to bring suit under the statutes which it has a duty to enforce, a regulatory agency need not be itself the victim. The Commission acts here under the authority of the Securities Exchange Act to protect the public and not to protect itself as an investor. Section 21(e) of the Securities Exchange Act permits the Commission to institute an action to enjoin violations of the provisions such as those allegedly involved here, or, similarly, any provision of the Act or the Rules thereunder, with no further allegations than that the defendants are engaged in acts and practices which have violated Section 10(b) or Rule 10(b)(5).

*Id.* at 611.

Our securities law has a provision similar to § 21(e) of the Securities Exchange Act. That provision is Iowa Code section 502.604, and it allows the State to seek court action to enforce the provisions of chapter 502. *Cf.* Joseph C. Long, *A Guide to the Investigative and Enforcement Provisions of the Uniform Securities Act*, 37 Wash. & Lee L.Rev. 739,

755–63 (1980) (describing state enforcement powers as reaching all parts of the Uniform Securities Act). Section 502.604 clearly implies that the State has standing under section 502.502.

Iowa's prohibition of fraudulent practices, as well as its enforcement provisions, closely track the prohibitions and enforcement of rule 10b–5 at the federal level. *See generally* Edward R. Hayes, *The New Iowa "Uniform" Securities Law*, 25 Drake L.Rev. 267 (1975). We find the *Wong* court's assessment of a similar statutory scheme persuasive and in line with the Supreme Court's position on similar matters. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 751 n. 14, 95 S.Ct. 1917, 1933 n. 14, 44 L.Ed.2d 539, 558 n. 14 (1975) ("[p]urchaser-seller rule imposes no limitations on the standing of the SEC to bring actions for injunctive relief under § 10(b) and Rule 10b–5"); *SEC v. National Sec., Inc.*, 393 U.S. 453, 467 n. 9, 89 S.Ct. 564, 572 n. 9, 21 L.Ed.2d 668, 680 n. 9 (1969) ("This is a suit brought by the Securities and Exchange Commission; the terms 'purchase' and 'sale' are relevant only to the question of statutory coverage. Therefore there are no 'standing' problems lurking in the case.").

The public policy statement in section 502.611 is further reason for us to find no standing problems "lurking" in this case. As mentioned, this provision requires us to interpret and implement chapter 502 "to effectuate its general purpose to protect investors."

VI. *Can the State Seek Remedies Under Iowa Code Section 502.604(2) Against Aiders and Abettors of Securities Fraud?*

Iowa Code section 502.604(2) permits the State to

> [b]ring an action in the district court ... to enforce compliance with [chapter 502].... [U]pon a proper showing ... the court may enter an order of rescission, restitution, or disgorgement directed at *any person who has engaged in an act constituting a violation of [chapter 502].*

(Emphasis added.)

McHose contends the italicized language permits the State to seek an order of rescis-

sion, restitution, or disgorgement against primary violators only and not against aiders and abettors. Essentially, McHose argues that because section 502.604(2) does not specifically mention remedies against aiders and abettors, none can be allowed.

Such an interpretation would render substantially meaningless the chapter 502 enforcement provisions against aiders and abettors. The result would be contrary to chapter 502's underlying public policy to protect investors. We must therefore strive to reach an interpretation that is reasonable and consistent with this underlying policy. *See* Iowa Code § 4.6(1) (when interpreting statute court may consider object sought to be obtained) and (5) (when interpreting statute court may consider consequences of a particular construction).

Section 502.503(1) makes aiders and abettors "liable jointly and severally with and to the same extent as [the primary violator]." This is an expression of aider and abettor status similar to that found in the criminal law where aiders and abettors may be charged, tried, and punished as principals. *See* Iowa Code § 703.1 (criminal aiding and abetting provision). For purposes of criminal responsibility and punishment aiders and abettors are therefore primary violators. Likewise, when the legislature authorized the remedies of rescission, restitution, or disgorgement against "any person who has engaged in an act constituting a violation of [chapter 502,]" we think it was using such language broadly to include both aiders and abettors and primary violators. Iowa Code § 502.604(2). Otherwise, the language "liable jointly and severally with and to the same extent [as the primary violator]" in section 502.503(1) would mean nothing as far as aiders and abettors are concerned.

## VII. *Was the Evidence Sufficient to Show That McHose Aided and Abetted the Commission of Securities Fraud?*

The State alleged that Starnes, Grady, and Diacide (1) sold unregistered securities in violation of the registration requirements of chapter 502 and (2) violated the antifraud provisions of section 502.401 in selling such securities. As to McHose, the State alleged that he aided and abetted the sale of unregistered securities in violation of section 502.401, the antifraud provisions. The aiding and abetting allegation raised the question whether McHose had the burden of proof on the knowledge element of aiding and abetting under section 502.503(1)(b) (an alleged aider and abetter can escape liability for aiding and abetting securities fraud by proving he or she "did not know, and was not grossly negligent in failing to know, of the existence of the facts by reason of which the liability is alleged to exist").

The district court did not apply the provisions of section 502.503(1)(b). In short, the court did not impose the burden of proof on McHose to show that he did not know, and was not grossly negligent in failing to know, of the existence of the fraud the other defendants were perpetrating on the investors. In refusing to apply section 502.503(1)(b), the court relied on *Foley v. Allard*, 427 N.W.2d 647 (Minn.1988). In *Foley* the court interpreted a Minnesota statute similar to section 502.503(1)(b). The Minnesota statute provided:

[E]very broker-dealer or agent who materially aids in the act or transaction constituting the violation, [is] also liable jointly and severally with and to the same extent as [the primary violator, unless the broker-dealer or agent can show:]

That [it] did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist.

*Foley*, 427 N.W.2d at 649 (citing Minn.Stat. § 80A.23(3)–(4) (1986)) (suit brought against broker for aiding and abetting securities fraud).

The court in *Foley* noted that, like Iowa, Minnesota had an antifraud provision similar to rule 10b–5. *Foley*, 427 N.W.2d at 650 n. 2. The court also noted that the Minnesota counterpart to Iowa Code section 502.611 provided that the Minnesota Securities Act "is to be construed so as to 'coordinate the interpretation of sections 80A.01 to 80A.31 with the related federal regulation.' " 427 N.W.2d at 650. For these reasons, the *Foley* court decided to follow federal case law that

established standards for aiding and abetting violations of rule 10b–5. *Id.* The *Foley* court adopted the three-prong test to establish aiding and abetting liability under rule 10b–5 followed in *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985). *Id.* at 650–51.

The *Metge* test differs significantly from the aiding and abetting provision of Iowa Code section 502.503(1)(b) and Minnesota Statute section 80A.23 because under the *Metge* test one attempting to establish aiding and abetting liability must prove the defendant had knowledge of the violation. *Metge,* 762 F.2d at 624. In adopting the *Metge* test, *Foley* virtually ignored the plain language of its own aiding and abetting statute, which we earlier set out. That statute required the alleged aider and abettor to prove it did not know, and in the exercise of reasonable care could not have known, of the violation. *See* Minn.Stat. § 80A.23.

Following the *Foley* reasoning, the district court here also adopted the *Metge* three-prong test for aiding and abetting and ignored section 502.503(1)(b). In fairness to the district court, we also applied the *Metge* test for aiding and abetting in a securities fraud setting. *See Tubbs v. United Cent. Bank, N.A.,* 451 N.W.2d 177, 182–83 (Iowa 1990). We did so, however, with no mention of the aiding and abetting provision in section 502.503(1). We leave for another day the application of section 502.503(1) in a securities fraud setting. We do so because the State never objected when the district court applied the *Metge* test and imposed the burden of proof on the State regarding the issue of knowledge. Nor does the State raise the issue on appeal. We therefore assume, without deciding, that the district court used the proper test for aiding and abetting and correctly placed the burden of proof on the State.

The three-prong test to establish aiding-and-abetting liability includes:

(1) the existence of a securities law violation by the primary party (as opposed to the aiding and abetting party);

(2) "knowledge" of the violation on the part of the aider and abettor; and

(3) substantial assistance by the aider and abettor in the achievement of the primary violation.

*Metge,* 762 F.2d at 623; *see also Tubbs,* 451 N.W.2d at 182–83 (apparently applying the test for purposes of analysis only).

In applying the test, a fact finder should not consider the three factors in isolation but relative to one another. *Metge,* 762 F.2d at 623. This is especially true as to the knowledge and substantial assistance factors. *Id.* Thus, where there is a minimal showing of substantial assistance, a greater showing of knowledge is required. *Id.*

A. *Securities violation by the primary party.* The district court found that Starnes, Grady, and Diacide had violated the antifraud provisions of section 502.401. Those three defendants have not appealed and that finding is not challenged on appeal. So we need not concern ourselves with the first element of aiding and abetting.

B. *Knowledge.* As to the knowledge element, the district court relied on the following definition mentioned in *Tubbs* and taken from *Federal Deposit Insurance Corp. v. First Interstate Bank, N.A.,* 885 F.2d 423 (8th Cir.1989), and *Woodward v. Metro Bank,* 522 F.2d 84 (5th Cir.1975):

"Knowledge" of the principal's acts, under the federal securities cases, has been interpreted to be less than actual knowledge; a general awareness has been held to be sufficient.

*Tubbs,* 451 N.W.2d at 183. As we did in *Tubbs,* we will assume for purposes of analysis that "general awareness" by an alleged aider and abetter is sufficient to constitute knowledge.

The district court also relied on the following explanation of "general awareness" in *Woodward:*

Knowledge may be shown by circumstantial evidence ... but the proof must demonstrate actual awareness of the party's role in the fraudulent scheme. As Professor Ruder argued ...:

If all that is required in order to impose liability for aiding and abetting is that illegal activity under the securities laws exists and that a secondary defendant,

such as a bank, gave aid to that illegal activity, the act of loaning funds to the market manipulator would clearly fall within that category and would expose the bank to liability for aiding and abetting. Imposition of such liability upon banks would virtually make them insurers regarding the conduct of insiders to whom they loan money. If it is assumed that an illegal scheme existed and that the bank's loan or other activity provided assistance to that scheme, some remaining distinguishing factor must be found in order to prevent such automatic liability. The bank's knowledge of the illegal scheme at the time it loaned the money or agreed to loan the money provides that additional factor. Knowledge of wrongful purpose thus becomes a crucial element in aiding and abetting ... cases.

*Woodward*, 522 F.2d at 96 (quoting David S. Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution*, 120 U.Pa.L.Rev. 597, 630–31 (1972)). In short, the knowledge prong is established by proof that the alleged aider and abettor knew of the illegal scheme and was aware of his or her assistance in furthering the scheme. We will assume for purposes of analysis this explanation of the knowledge prong.

The Eighth Circuit has illustrated how a fact finder should approach the knowledge prong:

A party who engages in atypical business transactions or actions which lack business justification may be found liable as an aider and abettor with a minimal showing of knowledge. Conversely, a party whose actions are routine and part of normal everyday business practices would need a higher degree of knowledge for liability as an aider and abettor to attach.

*Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991) (citation omitted).

■ The district court found that the State "presented no evidence that McHose had any 'actual awareness' of any fraudulent scheme being conducted by Diacide or any other defendant." The court then concluded

that the State had failed to prove the knowledge prong of the three-prong test for aiding and abetting. Our de novo review leads us to conclude otherwise. (For the balance of this opinion, we refer to Diacide, Starnes, and Grady collectively as Diacide unless otherwise indicated.)

As the State suggests, Diacide was perpetrating a "Ponzi scheme" in violation of Iowa Code section 502.401, the antifraud provisions of our securities law. A Ponzi scheme has been described as

a type of fraud which requires an ever increasing stream of investors in order to fund obligations to the earlier investors, with a resulting pyramiding of the liability of the enterprise. The appellation is derived from one Charles Ponzi, a famous Boston swindler. With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days. Ponzi collected nearly $10 million in 8 months ... using the funds of new investors to pay off those whose notes had come due.

*United States v. Shelton*, 669 F.2d 446, 449 n. 2 (7th Cir.1982).

Here Diacide sold ninety-day-promissory notes with 12.5 to 16.66% interest payable within ninety days. Over a three-year period Diacide sold these notes to more than seventy investors. Sixty-five of those investors lost over $1.4 million dollars. Diacide used most of this money to pay those involved in the scheme, their relatives or associates, and to make interest payments to early investors.

Before his retirement, McHose had been an executive officer in charge of bank marketing and the chairman of the board at the Nevada National Bank in Nevada, Iowa. He retired in 1980. He had been a banker since 1958. At the time of trial, McHose was eighty years old. He and his family owned ESP. ESP was a consultant to the Nevada Computer Center (NCC) in which McHose had an interest. McHose also had an ownership interest in Southwood Developers, Inc., a residential-condominium-development corporation. McHose knew Starnes very casually for the twenty years before 1987.

In approximately 1987 McHose began to associate professionally with Diacide and Starnes. Sometime after 1987 McHose acquired exclusive rights to market Diacide insecticide in Hawaii. He then attempted to market the insecticide in Hawaii, but never made any sales.

Starnes apparently had exclusive rights to market the Diacide insecticide in the United States. McHose obtained his rights from Starnes.

Sometime between mid–1988 and late–1989, Starnes approached McHose about helping her market the Diacide insecticide. On November 13, 1989, McHose, through ESP, entered into a written agreement with White Mountain to purchase 4000 cans of the product at four dollars per can. Starnes was supposed to buy the insecticide back as she could for resale. McHose was to profit on Starnes' purchases.

On September 18, 1990, Diacide entered into a financing agreement with ESP. Under the agreement Diacide sold 2250 pounds of bulk insecticide to ESP for $13,500. Diacide was to repurchase all of this product within sixty days for $15,750. In effect ESP would receive a return of 16.66%. Apparently, Diacide made the repurchase.

McHose continued to make loans to Diacide on similar terms. The first four loans were for 16.66% interest. According to McHose, by December 10, 1991, Diacide owed ESP $102,283. Most of the principal but not the interest was eventually repaid.

At some point Starnes purchased a house "under contract" from McHose. Diacide operated from this residence. Starnes defaulted and the property returned to McHose through forfeiture. Later, McHose allowed Starnes to use the property as collateral to secure an old loan. At the time of trial, Starnes still owed $35,000 on the transaction.

The fought-over period at trial primarily involved 1992 through 1994. As mentioned, in early 1992 Diacide began selling the "Diacide notes." These notes were very similar in terms to many of the financing agreements Diacide and McHose entered into between September 1990 and December 1991.

In August 1992 McHose entered into another financing agreement with Diacide for $31,800. McHose testified that Starnes showed him a $90,000 purchase order before the loan which was later shown to have been phony.

Between September 25, 1992 and February 25, 1993, nine deposits were made into ESP's bank account, apparently as payments on the $31,800 loan. At least three of these deposits were from checks made by investors to Diacide under the bogus note scheme. Diacide signed these checks over to McHose, who endorsed and deposited them in the ESP account. The checks were from: (1) Mr. Vetter on September 29, 1992 for $3000, (2) Harriet Roberts on December 16, 1992 for $5500, and (3) C.G. Nielsen on February 2, 1993 for $2000.

From March 26, 1993 to April 30, 1993, McHose allowed Diacide the use of ESP's checking account. Sometime in March 1994, McHose's long-time secretary prepared exhibit "MA" detailing the activity in the ESP account from March 26, 1993 to April 30, 1993. If she had any questions, the secretary consulted only two sources: (1) the check stubs from the ESP checkbook and (2) McHose himself. McHose had written all the checks and had filled out the check stubs. The purpose for the exhibit was to show that McHose did not keep any more investor money than he paid out.

The State used exhibit MA to show that McHose knew he was handling investor money. McHose's secretary looked at the check stubs with the letter "I" circled on them and deduced that "I" meant investor.

Exhibit MA listed the following transactions which are evidence that McHose was using investor money to further the fraudulent Ponzi scheme:

(1) Between September 1992 and May 1993, McHose deposited at least $108,000 in investor funds into the ESP account.

(2) On April 5, 1993, McHose deposited an investment check from Cora McClain for $6000, then withdrew $3000 from the $6000 and paid $1500 to salesman Richard Johnson, one of the defen-

dants, and $1500 to himself. These withdrawals would not have cleared but for McClain's investment money.

(3) Between April 14 and April 19, 1993, McHose deposited $48,000 from investors West, Nelson, and Sargeant into the ESP account. During that same period, McHose wrote a $4200 check to his daughter to pay her back for money she had invested in Diacide. This payment was dependent on investor money. McHose prepared a document in December 1993 for Starnes' information. The document lists Sargent as having received an "interest" payment from the ESP account.

(4) On April 16, 1993, McHose wrote a check for $25,000 to Southwood Developers, one of his corporations. The funds withdrawn depended upon investor money.

McHose's testimony itself provides additional evidence about his awareness of the fraudulent scheme. Between 1992 and 1993, McHose thought Diacide was probably a "negative net worth" company. The 1992–1993 sales were closing more slowly than he anticipated. McHose did not think he saw any funds going to any suppliers of insecticide. During this same period McHose believed that Starnes was unable to get a checking account in her name because of her past dealings with banks for writing insufficient fund checks. Although McHose testified he was doing no more than balancing a checkbook for Diacide, he also testified he stood behind her withdrawals and made up for shortfalls in deposits. He also testified he assessed his own risk in these transactions.

The next major development between McHose and Diacide happened on April 24, 1993, when McHose opened the "J.R. Grady" account. McHose testified that he was not happy commingling ESP and Diacide transactions so he set up a separate account for Diacide. However, there is an exhibit in evidence which purports to be an agreement between Starnes and McHose that all money deposited into the J.R. Grady account would be "payments" to McHose for past "advances."

According to McHose, he used "J.R. Grady" as a name on the account rather than Diacide because of "public relations" problems.

About this time, Diacide began the extensive use of credit cards McHose provided.

On May 5, 1993, McHose attended a luncheon at the request of Starnes. The three salesmen, Mr. Egly (one of the salesmen's cousins), Starnes, and Staci Reifschneider (a Diacide employee) were also present.

McHose's affidavit about the luncheon is in evidence and in it he states:

> The luncheon was attended by Starnes, Nelson, Johnson, a relative of Nelson's with the last name of Egly, and Staci Reifschneider. Starnes had indicated that the brokers would be making a report on the financing and sales. During the luncheon, Starnes and Reifschneider did most of the talking while we ate our lunch. Afterwards, Johnson gave a summary of how the business was going and said that everyone seemed to be getting paid. After he completed his summary, he indicated that he would go over the details with anyone interested. Since the financing and sales to investors did not concern me, I excused myself from the luncheon at that time.
>
> I have read portions of the affidavit of Mr. Egly. At no time during the luncheon did he or anyone else personally ask me for financial statements of Starnes or Diacide. In fact, I have no idea of why anyone would ask me this. Except for helping Starnes with the bank account situation, I have never had anything to do with Diacide's accounting or its financial statements.

Nelson, one of the salesmen, testified that, at some point during the May 5, 1993 luncheon, McHose stated the Diacide note program was an "expensive program, expensive money" and he—McHose—was shortly to arrange favorable loans from Chase Manhattan Bank "to pay everybody off."

Nelson also testified that McHose was seated next to Johnson when Johnson de-

scribed the note program and "how the money came in and how it went out."

At trial McHose did not deny saying that he would be getting a favorable loan—only that he did not make the statement until the seventh or eighth month of 1993. McHose also testified that the May 5, 1993 meeting provided him the first inkling about what was going on.

Mr. Egly, who had already begun investing by the May 5 meeting, testified:

(1) McHose stated he was a 5% owner of the company and had been involved with the company for nearly a decade;

(2) McHose stated he was involved in order to help run the business accounts and free people to do more marketing;

(3) in response to Egly's inquiry about certified financial audited statements, McHose sternly replied, "It shouldn't concern you about the financial audited statements. They will come out in the next six months to nine months and by that time, this program will be taken to someplace like CitiBank up in South Dakota for half over prime, and this company will be flying without all of you";

(4) in response to Egly's question at the meeting regarding whether the "notes" were collaterized and tied to specific orders, McHose stated (after several people told Egly that they could spend the money any way they wanted and it was not any of his business), "Folks, the gentleman knows what he is talking about, and he is right. He has the right to ask this question. He has the right to see this type of information";

(5) McHose implied he was selling in Hawaii and Canada;

(6) McHose would inform Egly if he (McHose) ever left Diacide;

(7) McHose·stated he would not meet with any investors after this meeting.

Egly produced contemporaneous handwritten notes substantially similar to his testimony. ·

Egly apparently removed his investment in time not to lose all of his money. Diacide, at the time of trial, owed Egly $8000.

The following transactions in the J.P. Grady account also bear on McHose's knowledge of the fraudulent Ponzi scheme and his actions in furthering the scheme:

(1) McHose deposited at least $394,000 of investor money into the account.

(2) On May 3, 1993, McHose used an investor's deposit of $24,000 to pay (a) ESP $10,000, (b) Grady, (c) salesmen, and (d) Jeff Starnes (Cathy Starnes' husband).

(3) On June 8, 1993, McHose deposited $3000 from investor Susan Mikelson and on that same date made an "investor" payment to her from the same account.

(4) On October 19, 1993, McHose used investor funds and ESP payments to pay an investor named Egly with a notation about "principal" and "interest" on the check.

(5) On October 11, 1993, McHose deposited investor Ovis Rae Abbott's check to Diacide. The check stated it was for an "investment." McHose used this deposit, together with other investor funds, to make (a) interest payments to investors, (b) payments to ESP, (c) a payment to one of McHose's corporations, (d) a payment to himself and his wife for $500, and (e) payments to the Diacide note salesmen.

In August 1993 McHose attended a dinner presentation for potential investors by Starnes. Starnes described the note program to the potential investors. Although McHose testified he denied hearing what was said, he did at one point describe Starnes' presentation as "one of the worst she ever made." By this time at least, McHose had advised Starnes that the interest was too high on the Diacide notes.

In October 1993, McHose took out a $30,000 loan supposedly to cover Diacide checks. During the same month, McHose wrote to Starnes about repayment of the $30,000 loan. The following month, McHose wrote Starnes expressing anger about "lies and overdrafts."

Although much of this evidence is circumstantial, it is persuasive and largely undenied. This evidence proves that McHose

knew what money was investor money. He also knew most of this money was being used to pay himself, his family, his corporations, Starnes, the three salesmen, Grady, and earlier investors. Finally, he knew that virtually none of the investor money went to buy the Diacide insecticide for which Diacide had represented to investors the money would be used.

Given McHose's vast business and banking experience, McHose must have eventually realized that these atypical business transactions amounted to a Ponzi scheme.

McHose's self-serving interpretation of this evidence borders on the incredible. McHose would have us believe that he did not know which money was investor money, although his own exhibits and his secretary's testimony tell us otherwise. He would also have us believe that he merely relied on Starnes' authorization of "excess" funds to be withdrawn for his repayment. The J.R. Grady account was set up under an agreement that McHose could withdraw under his *own* discretion. He testified that he was the only one who knew what was actually going on in the accounts, so how could he rely on Starnes to tell him what the excess was? The written agreement McHose had, as well as his testimony about how the accounts were run, belie McHose's proclaimed innocence.

We turn to the question whether McHose was aware that the Diacide notes Starnes and her crew were peddling were fraudulent and worthless. As to this point, McHose's argument boils down to this: there was a Chinese wall between him and any Diacide note information. In light of the May and August 1993 meetings, however, as well as McHose's testimony, we think he knew about the fraudulent nature of the notes.

McHose's own investments in Diacide should have given him a solid notion of the notes' terms. Additionally, he would need to know at least some of the terms to have a basis for his statement the note money was too expensive. If there was a Chinese wall, then McHose was the primary architect.

We accept Nelson's and Egly's testimony about what went on at the May 5, 1993 meeting as credible. We think their testimo-

ny establishes that the note program was in fact discussed in McHose's presence. From his intimate knowledge of Starnes' financial condition, McHose had to know her guarantees and the company's guarantees in the notes were worthless. He also had to know that representations in the notes that principal and interest would be repaid in ninety days were not true. Finally, he had to know that representations of how the investor money would be used were not true.

In our de novo review, we find McHose was aware of the fraudulent Ponzi scheme and of his role in it.

C. *Substantial assistance.* As mentioned, the third element of aiding and abetting requires that the alleged aider and abettor must have provided substantial assistance in the achievement of the primary violation.

We again turn to the district court's analysis on this element. The court looked to *Metge* for explanation of "substantial assistance." According to *Metge*, substantial assistance requires a showing (1) of a "substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff" or (2) that "the encouragement or assistance is a substantial factor in causing the resulting tort." 762 F.2d at 624.

The district court concluded there was no evidence that McHose substantially assisted a violation of the securities law. Whatever assistance McHose gave, the court noted, happened before the primary violations had occurred. Again, we disagree and conclude there is sufficient evidence to show that McHose provided substantial assistance in the achievement of the fraudulent Ponzi scheme.

According to *Metge*, substantial assistance can take the form of positive deeds of manipulation or deception or it can take the form of inaction. *Id.* If an alleged aider and abettor owes an independent duty to act or disclose, inaction can be a proper basis for liability under the substantial assistance test. *Id.* at 625.

Usually a duty to disclose arises from the relationship between the parties and will exist if there is a fiduciary or other similar

relation of trust and confidence between them. *Camp,* 948 F.2d at 460. State or federal law may determine fiduciary relationships and what duties flow from such relationships. *Id.*

Although there may be no duty to disclose and there is only inaction on the part of the aider and abettor, liability under the substantial assistance test may still result in a securities law setting. Thus, inaction "may provide a predicate for liability where the plaintiff demonstrates that the aider-abettor consciously intended to assist in the perpetration of the wrongful act." *Metge,* 762 F.2d at 625 (quoting *Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 800 (3d Cir. 1978)). It was under this rule that *Metge* determined a fact question existed on an issue of substantial assistance sufficient to overcome a motion for summary judgment. *Id.* at 630.

In *Metge,* defrauded investors sued a bank that had financed a corporation which sold worthless thrift certificates to the investors. *Id.* at 623–24. The evidence suggested an unusually favorable banking relationship between the bank and the defrauding corporation. This relationship existed at a time when the bank knew of the corporation's precarious financial position. The evidence suggested that the bank had knowledge of the thrift certificate program and its importance to the defrauding corporation's ability to repay its loan to the bank. The court found an inference from the evidence

> that, although [the bank] made no profit on its loans to [the corporation] nor even recovered its outstanding funds by postponing [the corporation's] demise, [the bank] may have been able to lever itself into a more favorable position than the holders of the thrift certificates.

*Id.* at 630. Thus, the court concluded that a fact question existed on whether the bank consciously intended to assist in the perpetration of the corporation's fraud.

We think the same analysis applies here. As *Metge* notes, "the distinction between positive action and deliberate inaction is elusive." *Id.* at 624. We will assume for purposes of our analysis that McHose owed no

duty to disclose and his conduct amounted to inaction.

Throughout the critical two-year period—1992 through 1994—McHose was providing Diacide enormous assistance. He provided Diacide checking accounts when it could not get them anywhere else, he covered bad checks, he provided credit card financing to Starnes so she could continue with her selling efforts, he provided loans to Diacide, he provided free accounting services, he provided Diacide fax machine services, he provided secretarial support, and he provided business phones. McHose was doing this to enable Starnes and others to make more sales to investors. Most, if not all, of his assistance would have been irreplaceable. McHose was not just Diacide's bookkeeper, he was its bank, creditor and equipment supplier, and he provided a home base. McHose provided Diacide all these benefits without risk to Diacide of public disclosure and independent disinterested scrutiny. Without McHose's assistance, the Ponzi scheme would have collapsed long before it did and with that collapse McHose would probably have lost most of his investment.

McHose had a motive to keep the scheme going. Like the bank in *Metge,* McHose was heavily involved financially with Diacide at a time when he knew that Diacide was in trouble financially and that its notes were worthless. McHose was surely aware that without his assistance Diacide could not continue and that he would probably lose his investment. At each of the many crises Diacide encountered, McHose stepped in to keep the operation going.

Although McHose may not have profited from his loans to Diacide, he was certainly able to lever himself into a more favorable position than the note holders. In the early part of 1992, when Diacide began selling the notes, Diacide owed McHose in excess of $100,000. He made loans in excess of $30,000 to Diacide thereafter. He was able to recoup nearly all of this investment, mostly through investor money. It was to McHose's advantage to keep this scheme going to make sure he recouped all of that money and his interest too.

McHose showed his true colors and his agenda to keep the scheme going in the May 5, 1993 confrontation with investor Egly. As recalled, when Egly asked about certified audited statements, McHose replied:

> It shouldn't concern you about the financial audited statements. They will come out in the next six months to nine months and by that time, this program will be taken to someplace like CitiBank up in South Dakota for half over prime, and this company will be flying without all of you.

Given McHose's intimate knowledge of Diacide's poor financial condition, irregular business practices, poor banking relations, and poor record keeping, McHose had to know that no reputable accounting firm would provide certified financial audited statements because the accounting firm probably could not do so under its auditing standards. And if by some chance such statements were provided, they would surely show what McHose already knew: The company was broke and its principals were perpetrating a Ponzi scheme. In addition, given McHose's own banking experience and acumen, he also had to know that there was zero chance that CitiBank would finance the scheme.

When we consider all the evidence together rather than in isolation, we are convinced McHose consciously intended to assist in the perpetration of a fraudulent scheme. The evidence is more than sufficient to show that McHose's assistance was a substantial factor in causing the fraud.

### VIII. *Summary and Disposition.*

In summary, we reach the following conclusions. First, preponderance of the evidence is the appropriate standard of proof for civil actions brought pursuant to Iowa Code chapter 502.

Second, Iowa Code section 502.503(1) provides the statutory authority for using aiding and abetting to establish secondary liability for securities fraud violations. In addition, the State has standing to use aiding and abetting against an alleged aider and abettor.

Third, the statutory language in the remedies provisions of Iowa Code section 502.604(2) is broad enough to allow the State to seek section 502.604(2) remedies against an alleged aider and abettor.

Last, in our de novo review, we find McHose aided and abetted the violation of the Iowa Code section 502.401 antifraud provisions. We reverse the district court's decision holding otherwise. We remand for further proceedings to allow the district court to grant appropriate relief consistent with this opinion.

We have considered all other issues raised. We find them without merit, unnecessary to discuss, or moot.

### REVERSED AND REMANDED.

All justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

I dissent.

The opinion of the court finds McHose to be subject to an order of rescission, restitution, or disgorgement under Iowa Code section 502.604(2) based on the court's belief that he accepted money from persons whom he should have known were engaged in an investment scheme wherein the participating investors would suffer losses. The money paid to him was for amounts owed on unrelated transactions. Irrespective of the burden of proof that is to be applied, this state of facts falls far short of rendering McHose legally liable for the investors' losses.

Under the rationale that this court applied in *State v. Caslavka*, 531 N.W.2d 102 (Iowa 1995), the funds of the investors became the property of McHose's debtors upon receipt and were not impressed by any trust. In accepting payment from monies that included these investors' contributions, McHose may have been seeking to acquire a preferential creditor's status. However, because the payments were supported by a past consideration, they are not subject to attack as being fraudulent. *See Wilkin Elevator v. Bennett State Bank*, 522 N.W.2d 57, 61 (Iowa 1994). This is significant because it would appear that these are the only monies that McHose could be required to disgorge under section 502.604(2).

The legal standard for liability for harm resulting to third persons from the tortious conduct of another as a result of so-called aiding and abetting is contained in Restatement (Second) of Torts section 876 (1979). Subparagraph (a) and subparagraph (c) of that section are clearly inapplicable to the situation before the court. The only remaining provision of section 876 on which an aiding and abetting liability could be predicated is subsection (b), which requires the actor to "[know] that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." McHose's activities, vis-a-vis the investment scheme, did not constitute substantial assistance with respect to the parties who were operating the scheme. There is nothing in the record to suggest that the scheme would not have gone forward in the absence of the acts of McHose. Moreover, the majority virtually concedes that as the scheme was so designed it was destined to fail under any circumstances. I would affirm the judgment of the district court.