**STATE of Iowa ex rel. Craig A. GOETTSCH, Appellant,**

v.

**DIACIDE DISTRIBUTORS, INC., Kathleen M. Starnes, Larry E. Kellogg, Bruce E. Nelson, Richard C. Johnson, and J.R. Grady, Defendants,**

and

**Sam McHose, Appellee.**

**No. 97–1815.**

Supreme Court of Iowa.

July 8, 1999.

Thomas J. Miller, Attorney General, and Anuradha Vaitheswaran, Assistant Attorney General, for appellant.

J. Russell Hixson of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellee.

Considered by McGIVERIN, C.J., and LARSON, NEUMAN, SNELL, and CADY, JJ.

McGIVERIN, Chief Justice.

This appeal involves further proceedings related to the State's securities fraud case against several defendants. *See* Iowa Code ch. 502 (1993). In a prior decision, we reversed a district court decision and judgment that dismissed claims against one of the defendants, Sam McHose, for lack of evidence that McHose aided and abetted securities fraud. *See State ex rel. Goettsch v. Diacide Distribs., Inc.,* 561 N.W.2d 369 (Iowa 1997) (*Diacide I* ). We remanded the case to the district court for further proceedings to allow the district court to grant appropriate relief consistent with our decision. *Id.* at 384.

In the appeal now before us, the State challenges the district court's judgment on remand concerning assessment of monetary relief and raises other issues concerning the disposition of attached assets.

Upon our review, we affirm in part, reverse in part and remand.

## I. Background facts and proceedings.

### A. *Diacide I.*

We briefly summarize the facts giving rise to the State's securities fraud case that was involved in *Diacide I. See id.* at 370–71.

In 1988 Kathleen Starnes and her brother, Joseph Grady, incorporated Diacide Distributors, Inc. to promote, sell, and distribute certain products, including an environmentally-friendly insecticide. Starnes was president of Diacide and Grady was vice-president. The insecticide was manufactured and packaged by White Mountain of America, a corporation based in Grinnell, Iowa.

Defendant Sam McHose became involved in the venture when he provided the initial financing to assist Diacide in purchasing the insecticide from White Mountain and to market the product. In November 1989, McHose, through his family-held corporation, E.S.P. & S., Inc. (ESP), entered into a written agreement with White Mountain to purchase 4000 cans of the insecticide at $4 per can. White Mountain and Starnes agreed to repurchase the insecticide from ESP at a price of $5.50 per can. Herman Tripp, an owner of White Mountain, conceived the terms of the agreement and Starnes executed it as director of marketing for White Mountain.

In the latter part of 1990 and early part of 1991, ESP, McHose's family-held corporation, loaned money to Diacide for inventory, marketing expenses, and operating expenses. Diacide agreed to repay the loans within sixty to 120 days at 16.66% interest. As of December 1991, Diacide allegedly owed ESP and McHose $102,283 on these loans.

In early 1992, Starnes began looking for additional capital, allegedly to keep Diacide going. To this end she recruited three licensed insurance agents, Richard Johnson, Bruce Nelson, and Larry Kellogg, to sell ninety-day-marketing-inventory receipts and ninety-day-contract notes (Diacide notes). Certain promises and guarantees concerning the return on the investment were made to customers who purchased the notes. From the early part of 1992 through 1994, Starnes and her sales crew sold Diacide notes to more than seventy investors, mostly elderly people. As was later discovered, the note program was a fraud or "Ponzi scheme." *See id.* at 378 (defining "Ponzi scheme"). Diacide used funds collected from new investors to pay off those whose notes had come due and to pay those involved in the scheme, their relatives or associates. As a result of the scheme, sixty-five of those investors lost more than $1.4 million.

The State of Iowa, through Craig A. Goettsch, Iowa superintendent of securities, filed an equity action against Diacide, White Mountain, Tripp, Starnes, Grady, Kellogg, Nelson, Johnson and McHose in

Iowa district court on March 3, 1994.[1] The petition alleged that the defendants violated various provisions of the Iowa Uniform Securities Act, *see* Iowa Code chapter 502, and sought numerous items of relief against the defendants. Among other things, the State sought, on behalf of the investors, restitution and disgorgement of profits against all defendants. *See* Iowa Code § 502.604(2) (authorizing various forms of relief, including restitution and disgorgement of profits).[2] Specifically, as to McHose, the State contended that, among other things, he aided and abetted securities fraud.[3]

Pursuant to the State's request, the district court ordered the defendants to place certain funds in escrow pending the outcome of the proceedings and also ordered that the funds held in ESP's (McHose's family-owned corporation) bank account be frozen based on the State's contention that investor funds had been deposited into the account. The district court also ordered prejudgment attachment of McHose's personal and real property, including a non-homestead residence in Nevada, Iowa. The Nevada residence was sold while the case was pending in district court and all of the sale proceeds were placed in the escrow account pursuant to the district court's order.

After a trial was held against Diacide, Starnes, Grady and McHose, the district court concluded that Diacide, Starnes and Grady had committed numerous securities violations, including securities fraud.[4] The court therefore entered judgment for restitution in favor of the State against Diacide, Starnes and Grady in the amount of $1,457,135. This amount represents all damages sustained by Diacide investors

---

1. ESP, McHose's family-owned corporation, was not named as a defendant.

2. Iowa Code section 502.604 provides:

> If it appears to the administrator [of securities] that a person has engaged or is about to engage in an act or practice constituting a violation of this chapter or any rule or order adopted or issued pursuant to this chapter, the administrator may do either or both of the following:
> 1. Issue an order directed at the person requiring the person to cease and desist from engaging in such act or practice.
> 2. Bring an action in the district court to enjoin the act or practice and to enforce compliance with this chapter or a rule or order adopted or issued pursuant to this chapter. Upon a proper showing a permanent or temporary injunction, restraining order, or writ of mandamus shall be granted and a receiver or conservator may be appointed for the defendant or the defendant's assets. In addition, upon a proper showing by the administrator, the court may enter an order of rescission, restitution, or disgorgement directed at any person who has engaged in an act constituting a violation of this chapter, or a rule or order adopted or issued pursuant to this chapter. The administrator shall not be required to post a bond.

3. Iowa Code section 502.503 provides in pertinent part:

> 1. Affiliates of a person liable under either section 502.501 or 502.502, partners, principal executive officers or directors of such person, *persons* occupying a similar status or performing similar functions for such person, persons (whether employees of such person or otherwise) *who materially aid and abet in the act or transaction constituting the violation,* and broker-dealers or agents who materially aid and abet in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless:
> a. With respect to section 502.501 and section 502.502, subsections 1 and 5, any person liable hereunder proves that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist; and
> b. With respect to section 502.502, subsections 2 and 3, any person liable hereunder proves that the person did not know, and was not grossly negligent in failing to know, of the existence of the facts by reason of which the liability is alleged to exist. (Emphasis added.)

4. For reasons not clear in the record, White Mountain and Tripp were out of this lawsuit by the time the case came to trial. The claims against the rest of the defendants were either dismissed or settled (i.e., claims against Kellogg, Nelson, and Johnson were settled). *Diacide I*, 561 N.W.2d at 371.

from the very beginning of the fraudulent Diacide note program.

The court dismissed the claims against McHose, however, finding there was insufficient evidence to support them. The district court ordered that all funds in ESP's corporate bank account, which had been frozen, and the proceeds from the sale of the Nevada property be released to McHose.

The State appealed and McHose cross-appealed. None of the other defendants appealed.

On appeal, we concluded, among other things, that (1) Iowa Code section 502.503(1) may be utilized by the State to impose secondary liability on persons who aid and abet securities fraud; (2) that the remedies established in section 502.604(2) (order of rescission, restitution, or disgorgement) may be utilized by the State against aiders and abettors as well as primary violators; and (3) that McHose aided and abetted the violation of Iowa Code section 502.401 antifraud provisions. *Diacide I*, 561 N.W.2d at 384. We ordered that the case be remanded for further proceedings to allow the district court to grant appropriate relief consistent with our opinion. *Id.*

### B. District court proceedings upon remand.

Upon remand, the State sent a proposed order to the district court concerning appropriate relief and disposition of the case. The State also sent a copy of the proposed order to counsel for defendant McHose, requesting any response thereto as soon as possible and indicating that the State planned to submit the order to the court by June 3, 1997. McHose's counsel wrote to the State on June 6 expressing his disagreement with the terms of the proposed order and sent a copy of his letter to the court.

Without holding a hearing, and before receiving McHose's comments, the district court signed and filed the State's proposed order on June 9, 1997, entering judgment against McHose and in favor of the State for $1,457,135 and making disposition of certain attached and escrowed property. The parties, however, did not receive a copy of the order until July 12, 1997.

On August 12, 1997, McHose filed a combined motion to vacate or modify judgment and petition for relief pursuant to Iowa rule of civil procedure 252, requesting the court to vacate the June 9 order because the clerk of court failed to promptly notify the parties of that order. The State filed a resistance.

After hearing, the district court entered an order on October 16, 1997, sustaining McHose's motion to vacate the June 9 order. The district court also concluded that based upon our decision in *Diacide I*, "McHose had knowledge of the details of Diacide's note program on or about May 5, 1993. Thus, any investor monies he may have obtained after this date are tainted." The court further concluded, however, that it was not "equitable to enter a judgment against McHose requiring him to repay amounts taken from investors prior to his involvement with Defendants Diacide and Starnes." The court therefore did not hold McHose jointly and severally liable for the full $1,457,135 amount lost by investors, but rather only entered judgment for disgorgement in the amount of $102,-283 in favor of the State against McHose for investors' funds that McHose used to repay himself for his investment in Diacide.

The district court also ordered that the frozen ESP bank account funds should be released to McHose. In addition, the court ordered that $19,141.33, which represents one-half of the proceeds from the sale of the Nevada property which was attached prior to judgment, should be returned by the State to Imogene McHose, wife of Sam McHose.

The State appealed.

## II.  Standard of review.

■ This case comes to us in part from an order and judgment on defendant McHose's motion to vacate the district court's judgment of June 9, 1997. *See* Iowa R. Civ. P. 252 (grounds for vacating or modifying judgment). Actions brought pursuant to rule 252(b) are law actions. *In re Marriage of Cutler*, 588 N.W.2d 425, 429 (Iowa 1999). Our standard of review in such cases is for correction of errors at law, not de novo. *In re Marriage of Dunn*, 455 N.W.2d 923, 924–25 (Iowa 1990).

■ However, after the district court ruled on McHose's motion to vacate and thereby set aside the June 9, 1997 judgment, the focus was on the proper content of a judgment on remand in this equity case that would be consistent with *Diacide I*, the applicable statutes and the record. Accordingly, our standard of review in that regard is de novo. *Diacide I*, 561 N.W.2d at 371. Under this standard, "[w]e give respectful consideration to the district court's fact findings, especially when witness credibility is an issue, but we are not bound by those findings." *Id.* at 372 (citing Iowa R.App. P. 14(f)(7)).

## III. *Diacide I* and the law of the case doctrine.

We first point out that the district court correctly sustained McHose's Iowa rule of civil procedure 252 motion to vacate the June 9, 1997 order based on the clerk of court's mistake or neglect in the delay in notifying the parties of the judgment entered that date.

As to the proper content of a judgment after remand, the State contends that the district court's only remedy was to enter judgment against McHose holding him jointly and severally liable for the $1.4 million judgment entered against the other defendants. The State's contention is that the district court was prohibited from reconsidering the issue of McHose's knowledge of the fraudulent scheme. Upon our

review, we conclude that the district court erred in reconsidering the knowledge element because of the law of the case doctrine.

■ "The doctrine of the law of the case represents the practice of courts to refuse to reconsider what has once been decided." *State v. Grosvenor*, 402 N.W.2d 402, 405 (Iowa 1987); *see also Springer v. Weeks & Leo Co.*, 475 N.W.2d 630, 632 (Iowa 1991) (noting that the law of the case doctrine may not apply when law has been changed by legislative enactment, or where controlling law has been clarified by judicial decisions following remand). Pursuant to this rule, "legal principles announced and the views expressed by a reviewing court in an opinion, right or wrong, are binding throughout further progress of the case upon the litigants, the trial court and this court in later appeals." *Grosvenor*, 402 N.W.2d at 405; 5 Am. Jur.2d *Appellate Review* § 605, at 300–01 (1995) (discussing doctrine). The law of the case doctrine does not apply to dictum, *Feller v. Scott County Civ. Serv. Comm'n*, 482 N.W.2d 154, 159 (Iowa 1992), or if the facts before the court upon the second trial are materially different from those present in the first case. *Grosvenor*, 402 N.W.2d at 405. Additionally, the doctrine "applies only to so much of an opinion by an appellate court in a former decision in the same case as was essential to the determination required of the court." *Wolfe v. Graether*, 389 N.W.2d 643, 651 (Iowa 1986).

We now consider what aspects of our *Diacide I* opinion were binding upon the district court on remand according to the law of the case doctrine.

## IV.  The extent of McHose's liability.

### A.  Joint and Several liability.

■ We disagree with McHose's contention that the State is somehow barred from holding him jointly and severally liable for the $1,457,135 judgment entered against the other defendants because it did not plead or otherwise mention joint and sev-

eral liability in its pleadings. We stated in *Diacide I* that "section 502.503(1) imposes secondary liability on *any* person who 'materially aids[s] and abet[s] in the act or transaction constituting' the securities fraud defined in section 502.401." 561 N.W.2d at 374.

Later, we explained that similar to the remedies found in Iowa Code section 703.1, an aider and abettor may be held liable to the same extent under Iowa Code section 502.503(1) as a principal, stating:

> *Section 502.503(1) makes aiders and abettors* "*liable jointly and severally with and to the same extent as [the primary violator]*." This is an expression of aider and abettor status similar to that found in the criminal law where aiders and abettors may be charged, tried, and punished as principals. *See* Iowa Code § 703.1 (criminal aiding and abetting provision). *For purposes of criminal responsibility and punishment aiders and abettors are therefore primary violators.* Likewise, when the legislature authorized the remedies of rescission, restitution, or disgorgement against "any person who has engaged in an act constituting a violation of [chapter 502,]" we think it was using such language broadly to include both aiders and abettors and primary violators. Iowa Code § 502.604(2). Otherwise, the language "liable jointly and severally with and to the same extent [as the primary violator]" in section 502.503(1) would mean nothing as far as aiders and abettors are concerned.

*Id.* at 376 (emphasis added).

We believe that our discussion in *Diacide I* concerning an aider and abettor's liability for securities fraud clearly established the rule that joint and several liability exists for any proven violation of the securities act. This rule therefore became the law of the case and was binding on the district court upon remand. *Grosvenor,* 402 N.W.2d at 405.

## B. What is the appropriate monetary remedy?

■ Having determined that *Diacide I* established the State's right to pursue a joint and several theory of liability against McHose, we must now decide whether the district court's award of monetary relief against McHose in favor of the State is in accordance with our decision in *Diacide I,* the applicable statutes and the record.

We noted in *Diacide I* that the State's aiding and abetting contention against McHose raised a question concerning the knowledge element of aiding and abetting under section 502.503(1)(b). 561 N.W.2d at 376. Pursuant to section 502.503(1)(b), an alleged aider and abetter can escape liability for aiding and abetting securities fraud by proving he or she "did not know, and was not grossly negligent in failing to know, of the existence of facts by reason of which the liability is alleged to exist." The district court in its ruling before the first appeal, however, did not apply the provisions of section 503.503(1)(b), but rather relied on *Foley v. Allard,* 427 N.W.2d 647 (Minn.1988), which in turn adopted a three-prong test to establish aiding and abetting liability set forth in *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985). The State and McHose did not object when the district court applied the *Metge* test, which imposes the burden of proof on the State regarding the issue of knowledge, and did not raise the issue on appeal in *Diacide I.* We therefore left the further application of section 502.503(1) for future securities fraud cases and analyzed the district court's use of the *Metge* test to determine whether the evidence was sufficient to show that McHose aided and abetted the commission of securities fraud. *Diacide I,* 561 N.W.2d at 377. Section 502.503(1)(b) therefore has no application to this case due to the above record.

We stated in *Diacide I* that knowledge of a securities law violation on the part of an aider or abettor "is established by proof that the alleged aider and abettor knew of the illegal scheme and was aware of his or

her assistance in furthering the scheme." *Id.* at 378. We also proceeded to outline the events and transactions showing McHose's participation in the fraudulent note program and ultimately concluded that the district court wrongly decided there was insufficient evidence that McHose aided and abetted the commission of securities fraud. In doing so, we did not specify a particular date as the point at which McHose had knowledge of the illegal scheme. Rather, we pointed to specific events and transactions showing McHose's knowledge of the scheme. In particular, we noted that: (1) as early as 1990, Diacide and ESP—McHose's family-owned corporation—entered into a financing agreement and that McHose made loans to Diacide during the course of the scheme; (2) the notes sold by Diacide to defrauded investors were very similar in terms to many of the financing agreements between Diacide and McHose entered into between September 1990 and December 1991; and (3) between September 25, 1992 and February 25, 1993, nine deposits were made into ESP's bank account, three of which were from checks made by investors to Diacide under the bogus note scheme. *Id.* at 380. We also noted that McHose's testimony itself provided evidence about his awareness of the fraudulent scheme; portions of this testimony related to events that occurred between 1992 and 1993.[5] *Id.* Based on these events, in addition to those discussed more thoroughly in *Diacide I,* we found that "McHose was aware of the fraudulent Ponzi scheme and of his role in it," *id.* at 382, and further found that "McHose aided and abetted the violation of the Iowa Code section 502.401 antifraud provisions." *Id.* at 384. Our findings and conclusions in this equity action therefore became the law of the case, which were

binding upon the district court during the course of the proceedings on remand.

On remand, the district court apparently believed that it had to establish a certain date as to when McHose acquired knowledge of the fraudulent nature of Diacide's scheme and the approximate date that he acquired knowledge that he was assisting therein. The district court picked May 5, 1993, (when McHose had a luncheon meeting with the other defendants involved in the fraudulent scheme) as the date that McHose acquired the requisite knowledge and reasoned that McHose should not be held liable for monies the other defendants fraudulently obtained from investors before May 5, 1993. Based on this finding, the district court concluded "it would not be equitable to enter a judgment against McHose requiring him to repay amounts taken from investors prior to his involvement with Defendants Diacide and Starnes." Thus, the only judgment entered by the court was for disgorgement of $102,283 that McHose repaid himself from investors' money in the ESP bank account.

Upon our review, we believe the district court misinterpreted our statements in *Diacide I* to mean that McHose's involvement and knowledge of the fraudulent note program was somehow limited to a certain time period, which in turn limited the extent of his liability. We believe our opinion in *Diacide I* showed a summary of events and transactions outlining McHose's involvement in the fraudulent scheme, including events that occurred long before the May 5, 1993 meeting. As indicated above, the findings outlining McHose's involvement in, and knowledge of, the fraudulent scheme and our conclusion that he aided and abetted securities fraud became the law of the case. The district court was bound by these findings and therefore should have entered an ap-

---

5. We mentioned that McHose testified "that the May 5, 1993 meeting provided him with the first inkling about what was going on," *Diacide I,* 561 N.W.2d at 381, but we also noted that McHose's testimony, which referred to events occurring in 1992, provided additional evidence of his awareness of the fraudulent scheme. Thus, while McHose may have testified he became aware of the scheme in May 1993, the record shows this statement to be inaccurate.

propriate judgment in the same amount as had been entered against the other defendants. The district court therefore erred and should have entered restitution judgment in the amount of $1,457,135 plus applicable interest in favor of the State and against McHose as an aider and abettor pursuant to Iowa Code sections 502.604(2) and 502.503(1). Accordingly, we reverse the district court's judgment on this issue.

### V. Who is entitled to the ESP funds?

A. In April 1994, the district court ordered that bank checking account assets of ESP, McHose's family-owned corporation, be frozen pending the outcome of these proceedings, based on the State's contention that investors' funds were deposited into the account. In its May 24, 1995 order dismissing the aiding and abetting claim against McHose, the district court also ordered that funds in the frozen ESP bank account be released to McHose. The State appealed this issue in *Diacide I* and McHose referred to it in his notice of cross appeal. We find that nothing we said in *Diacide I* disposed of this issue and we will therefore consider is merits in this appeal.

■ B. The State contends the district court erred in releasing from State control the ESP funds held in the frozen account. We disagree. The State does not dispute the fact that it did not name ESP as a defendant in these proceedings. As we noted in *Diacide I*, the record shows that McHose wrote checks from the ESP account, using investor money, between March 26, 1993 and April 30, 1993, allowed Diacide the use of ESP's checking account for Diacide business, and as early as September 1992 deposited investor funds into the ESP account. 561 N.W.2d at 379–80. This evidence was sufficient to justify the district court's issuance of a temporary injunction to freeze ESP's assets pursuant to Iowa Code section 502.604(2) to prevent further securities act violations. *Cf. People ex rel. Edgar v. Miller,* 110 Ill.App.3d 264, 65 Ill.Dec. 814, 441 N.E.2d 1328, 1332 (1982) (injunction that froze defendant's bank accounts was not overbroad and noting that freezing bank accounts of securities law violators appears to be an effective way of stopping violations of the securities act).

However, nothing in Iowa Code chapter 502 gave the district court authority to dispose of ESP's assets held in the frozen bank account because ESP was not named as a defendant. Nor did the State assert a theory of "piercing the corporate veil" against McHose. Thus, while the district court had the statutory authority to freeze the assets of ESP held in the corporate bank account, it did not have personal jurisdiction to dispose of ESP's assets as part of the State's securities fraud case against McHose. Nothing we say on this issue, however, affects the State's right to pursue McHose's ownership interest in ESP to satisfy its judgment against defendant McHose.

Accordingly, we affirm the judgment of the district court on this issue.

### VI. Who is entitled to the proceeds from sale of Nevada home?

A. Prior to this suit, defendant McHose and his wife owned a non-homestead residence in Nevada, Iowa. After the State filed its original petition against McHose and the other defendants, McHose transferred to his wife, Imogene McHose, his interest in the home. The district court imposed a prejudgment attachment lien on that property pending outcome of the case. Before trial, McHose's wife sold the Nevada property and the court ordered that the sale proceeds be deposited into an escrow account. The order specifically stated that placement of the proceeds from the sale "is not intended to release or prejudice any right Imogene McHose may have in any of the post-closing proceeds."

At the time the district court in 1995 dismissed the securities fraud claim against McHose, the court also ordered that one-half of the proceeds deposited in

the escrow account be released to McHose's wife, representing her interest in the property. In the October 16, 1997 order, the court confirmed that one-half of the proceeds be released to McHose's wife.

The State appealed this issue in *Diacide I* and McHose referred to this issue in his notice of cross appeal. However, we find that nothing we said in *Diacide I* disposed of this issue and we will therefore consider its merits.

 B. Upon our review, we conclude that the district court in its October 16, 1997 order properly released one-half of the escrowed net sale proceeds from the Nevada property to Imogene McHose. She was not a party to this action and was a one-half owner of the realty before the transfer by McHose to her of his interest in it. Thus, we conclude she is the owner of one-half of the net proceeds held in escrow. McHose does not now contest the other one-half of the proceeds being paid to the State.

We affirm the judgment of the district court on this issue.

### VII. Disposition.

We conclude that our decision in *Diacide I* affirmatively established that defendant Sam McHose, as an aider and abettor, acquired knowledge of Diacide's fraudulent note program and was aware of the scheme at all material times. We thus conclude the district court should have entered judgment against McHose as an aider and abettor in favor of the State for $1,457,135 plus applicable interest and that McHose can be jointly and severally liable with the other defendants for this amount.

We further conclude that the district court properly released the funds held in the frozen ESP corporate bank account from State control and properly released one-half of the net proceeds from the sale of the Nevada home to McHose's wife, Imogene McHose.

We affirm in part, and reverse in part the judgment of the district court. We remand for further proceedings for entry of judgment in conformance with this opinion. Costs on appeal should be taxed one-half to the State and one-half to defendant McHose.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**