STATE of Iowa, ex rel., Thomas J. MILLER, Attorney General of Iowa, Appellee,

v.

HYDRO MAG, LTD., and Donald Van Gorp, Appellants.

No. 87–1377.

Supreme Court of Iowa.

Feb. 22, 1989.
As Corrected May 11, 1989.

See also, Iowa, 379 N.W.2d 911.

Bert A. Bandstra, Knoxville, for appellants.

Thomas J. Miller, Atty. Gen., Susan Barnes and Steven Foritano, Asst. Attys. Gen., for appellee.

Considered by McGIVERIN, C.J., and LAVORATO, NEUMAN, SNELL and ANDREASEN, JJ.

ANDREASEN, Justice.

In this appeal we interpret and apply Iowa's consumer fraud act, Iowa Code section 714.16 (1983). This case is before us on appeal from a district court order permanently enjoining Hydro Mag, Ltd. and Donald Van Gorp from making various claims concerning electromagnetic water-treatment devices. Hydro Mag and Van Gorp were also ordered to pay restoration of monies to several consumers. The State of Iowa cross appealed from the court's refusal to allow restoration to a customer whose claim had been denied in small claims court.

I. *Background.*

Donald Van Gorp resides in Pella, Iowa, and has been a long-time insurance and real estate agent. Van Gorp became interested in the electromagnetic treatment of water in 1977 when he moved into a new home and experienced difficulty with the water. He bought an electromagnetic water softner from a Florida company. The device initially improved the water condition, but the results soon disappeared. In May 1979, Van Gorp built his first prototype of this machine. Eventually he patented this device and formed Hydro Mag, Ltd. Van Gorp was the sole officer, director and shareholder of Hydro Mag, Ltd.

Hydro Mag's advertisements claimed:

When attached to your home or industrial water supply, the Hydro–Mag electromagnetically prevents the elements in your water from forming normal chemical reactions that cause hard-water scale, rust and corrosion. Instead of joining together to cause you problems, these elements remain dissolved and simply flow harmlessly out of the system.

The Hydro–Mag system [provides]

| | |
|---|---|
| Clean Clothes | Proper Pressure |
| Less Detergent | Shiny Fixtures |
| Nice Skin | Better Health |
| No Odors | Sparkling Dishes |
| Clean Pipes | |

Hydro–Mag can make the following statement without reservation.

The system will stop the continued build-up of scale and rust and present scale and rust will be eliminated or greatly reduced.

Van Gorp admitted that these claims were not based on any scientific information. No scientific tests were conducted on any of the Hydro–Mag models prior to their sale. Van Gorp, a high school graduate, has no formal training in engineering, physics or chemistry.

The State produced five lay witnesses who testified as to their experiences with two models of the Hydro–Mag. Each was promised that the Hydro–Mag would reduce water hardness, take away scale and corrosion, and would provide the properties of soft water. They were told these results would occur immediately and that there would be no maintenance involved in the Hydro–Mag.

Each witness testified that the Hydro–Mag did not improve their water. In at least one situation the condition of the water worsened. Although Hydro Mag representatives were contacted, they were unable to make any improvements. In some cases, these representatives made no effort to take water samples, test the water, or inspect the source of the water. In one case, Van Gorp replaced the original "model '79" with a later model "SSAL." The newer model produced no difference. Each of these five consumers eventually discontinued their use of the Hydro–Mag.

The State produced evidence which demonstrated that there was no scientific basis for the claims made by Hydro–Mag. Dr. Douglas Finnemore, a physicist at Iowa State University, testified that the Hydro–Mag was incapable of producing enough energy to cause chemical changes in water by either preventing the bonding of certain elements or affecting the crystalization process. The State also offered the testimony of Dr. Edward R. Baumann, a professor of civil engineering at Iowa State University. Dr. Baumann has a Ph.D. in sanitary engineering and is a specialist in water treatment.

At the request of the State, Dr. Baumann conducted tests of the Hydro–Mag. Prior to conducting the tests, Dr. Baumann received the following claims in writing from Hydro–Mag.

> Our company does not claim that this unit is the panacea for all water problems. For example, the Hydro–Mag does not kill bacteria. This unit does not remove any chemicals from the water, nor does it add any.

> However, the number of units in the field at this time indicate a significant and noticeable effect in reducing many of the undesirable qualities of hard waters. Tests at locations both before and after installation disclose reductions in total hardness, calcium, magnesium, iron acidity (ph), carbon dioxide, alkalinity, sulfate, nitrate, chloride, sodium, and fluoride. Also, the system will stop the continued build of scale and rust, and present scale and rust will be eliminated or greatly reduced.

> I know you fully realize the ramifications of a working unit of this type. The Hydro–Mag could truly revolutionize the water industry.

> Our company is aware of your lofty credentials in the water purification field. A positive report from you and your colleagues would give us the technical support we lack at the present time.

Dr. Baumann's tests found no change in the overall hardness of water, no change in the water soap-consuming capacity and no change in the sodium content of the water. Dr. Baumann testified that the Hydro–Mag is worthless for the treatment of water used in a home.

In addition, the State offered evidence of several major studies conducted which indicated that there were no beneficial effects on the quality of water treated with magnetic water treatment devices. There have also been reports of beneficial uses of such devices, however, these reports did not involve situations found in a home or typical farming operation.

Dr. Leland Cole, a Ph.D. in physical chemistry testified on behalf of Hydro–Mag. Dr. Cole conducted a test concerning the Hydro–Mag's ability to reduce scaling. He concluded that the Hydro–Mag does reduce scaling. However, he did not test the Hydro–Mag to substantiate claims that Hydro–Mag would reduce the overall hardness of the water.

Hydro–Mag introduced testimony from five satisfied customers; a mink farmer, two chicken farmers, a dairy farmer, and a baker. Each of these individuals believed that the Hydro–Mag was successful in relieving their water problems. None of these situations involved controls or water testing procedures to determine whether the positive effects were caused by the Hydro–Mag. In each situation, there were other variables which may have accounted for the positive results.

The district court concluded that in order to obtain injunctive relief, the State must prove the following two elements: (1) a material misrepresentation, and (2) the intent to induce the purchaser to act or refrain from acting. The district court required two additional elements, justifiable reliance and damages, to be established for restoration of the purchase price to the customers. The court found that the State had established these elements in regard to an injunction and restoration for four of the consumers. The court held that the claim of a fifth consumer was precluded because the consumer's claim had been denied in small claims court.

## II. *Standard of Review.*

■ Our review of this equity action is de novo. Iowa R.App.P. 4. We give weight to the findings of the trial court but are not bound by them. Iowa R.App.P. 14(f)(7). The State must establish each of the necessary elements by a preponderance of clear, convincing, and satisfactory evidence. *See Wilden Clinic, Inc. v. City of Des Moines*, 229 N.W.2d 286, 292 (Iowa 1975); *Kelly Tire Serv., Inc. v. Kelly–Springfield Tire Co.*, 338 F.2d 248, 252 (8th Cir.1964).

## III. *Issues.*

Three issues are raised in this appeal. First, we must determine what elements

must be established to maintain an action for injunction and restoration under Iowa Code section 714.16. Second, we must determine whether the State has established those elements in this case. Finally, we will review the district court's holding that a decision in small claims court precluded the restoration of monies to one of the consumers.

### IV. *Elements Required by the Iowa Consumer Fraud Act.*

■ It was originally believed that a freely competitive economy was sufficient to protect buyers from fraudulent practices. *See* Note, *Consumer Protection Under the Iowa Consumer Fraud Act,* 54 Iowa L.Rev. 319, 326 (1968). A dominant theme in commercial law was *caveat emptor,* "let the buyer beware." Lovett, *State Deceptive Trade Practice Legislation,* 46 Tulane L.Rev. 724, 726–27 (1971–72). The consumer was assumed to be able to strike a fair bargain with any seller, and the customer was individually responsible to remedy any deficiencies. Defrauded customers were left with a common-law action for fraud against the seller as their primary recourse. *See* Note, *Developments in the Law: Deceptive Advertising,* 80 Harvard L.Rev. 1005, 1016–17 (1967). The protection afforded consumers by common-law remedies was generally ineffective. The burdens of a common-law action were "sufficient to dissuade all but the most persistent and most seriously injured customer." *Id.* In Iowa, an action for common-law fraud required the purchaser to prove reasonable reliance, misrepresentation, knowledge of falsity, and intent to deceive. *See* Note, 54 Iowa L.Rev. at 321. The difficulties in proving these elements were summarized by one commentator:

> The purchaser willing to seek recovery of the nominal sum usually involved was likely to be told by the court that *scienter* had not been adequately proved, that his reliance on the misrepresentation was unreasonable because he should have examined the goods or obtained the counsel of impartial and reliable persons, that the representations concerned matters of opinion and thus—as "puffing"—should

have been treated with skepticism, or that in any case he had not sufficiently demonstrated that his purchase was induced by the advertisement.

Note, 80 Harvard L.Rev. at 1017 (citations omitted).

Eventually, however, large scale marketing and manufacturing reached a point where government involvement became necessary. The Iowa Consumer Fraud Act was enacted in 1965 in order to protect the public from unfair and deceptive business practices. The Consumer Fraud Act provides the attorney general with broad powers to investigate acts which may be "unlawful" as defined by Iowa Code section 714.16(2)(a) (1983). The attorney general may seek and obtain in district court an injunction prohibiting acts defined as unlawful. *See* Iowa Code § 714.16(7). The district court may enter such orders as necessary to prevent fraudulent acts and to restore to any person money or property taken by unlawful acts. *Id.* The basis for both injunctive relief or restoration of monies is an unlawful practice. An unlawful practice is defined as

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

Iowa Code § 714.16(2)(a) (1983). Early commentators interpreted this section as omitting the common-law requirements of reasonable reliance and damage. *See* Note, *Consumer Protection Under the Iowa Consumer Fraud Act,* 54 Iowa L.Rev. 319, 326 (1968).

There have been relatively few cases dealing with the Iowa Consumer Fraud Act. Our principle decision concerning the Consumer Fraud Act was *State ex rel. Turner v. Limbrecht,* 246 N.W.2d 330 (Iowa 1976). In *Limbrecht,* the attorney

general brought an action under the Iowa Consumer Fraud Act against several individuals involved in cemetery merchandise and services. One of the individuals sold his interest in the business prior to July 4, 1965, the effective date of the Consumer Fraud Act.[1] *See id.* at 331. *Limbrecht* addressed two basic questions. First, whether the Consumer Fraud Act could be retroactively applied, and second, whether the attorney general may obtain restoration of monies when there is no ground for injunctive relief. *See id.* at 331–34.

We determined that the Consumer Fraud Act was to be given retroactive application. *Id.* at 333. In order to give this law retroactive application, we found that the Consumer Protection Act was plainly remedial and not substantive. We went on to state:

> We believe the civil provisions of the section are plainly remedial and not substantive. It is clear the defrauded parties could themselves have brought a common law fraud action under the pleaded facts....
>
> ....
>
> It is true § 713.24(2)(a), in defining unlawful frauds, does not specify reliance and damages. But that definition, with its omission does not reach the description of when injunction or restoration is appropriate. In order to prevail the attorney general was still required to allege and prove reliance and damages. *Accordingly we find no difference between the actionable fraud alleged by the attorney general and the common law action for fraud available to injured parties on an individual basis prior to the advent of § 713.24.*

*Id.* at 333 (emphasis added). We went on to hold that the retroactive application of the Consumer Fraud Act was constitutional, *id.* at 334, and that a suit for restoration of monies can be brought either independently or in conjunction with a suit for injunction, *id.* at 335.

Based upon *Limbrecht*, the district court found that reliance and damages must be established in an action for restoration under section 714.16. We recognize that the language of *Limbrecht* is susceptible to that interpretation. That language was not, however, necessary to the holding and we will not use that language to determine the necessary elements in this case. We now hold that reliance and damages are not elements which need to be established in an action for restoration or injunctive relief under Iowa Code section 714.16.

Several factors favor this holding. First, the plain language of section 714.16 establishes that the basis for an action to enjoin or restore is to be based on an unlawful practice. An unlawful practice is defined by Iowa Code section 714.16(2)(a) as any misrepresentation of a material fact with the intent that others rely upon such misrepresentation "whether or not any person has in fact been mislead, deceived or damaged thereby." This statutory language expresses a clear intent that the elements of reasonable reliance and damages are not necessary in an action brought by the attorney general under the Consumer Fraud Act. As stated earlier, the historical development of consumer law reveals that the Consumer Fraud Act was enacted in order to better protect consumers from fraud. Eliminating the common-law elements of reliance and damages is essential to the purpose of the Consumer Fraud Act.

Several states have adopted a definition of unlawful acts in their respective consumer protection acts which is similar to section 714.16(2)(a). *See, e.g., Ariz.Rev.Stat. Ann.,* § 44–1522(A) (West 1987); *Del.Code Ann.,* tit. 6, § 2513 (Michie 1975); *Ill.Ann. Stat.* Ch. 121½, para. 262, § 2 (Smith–Hurd 1988–89). The Iowa Consumer Fraud Act was patterned after the Illinois Consumer Fraud Act. *See* Note, *Consumer Protection Under the Iowa Consumer Fraud Act,* 54 Iowa L.Rev. 319, 324–25 (1968).

Illinois courts, as well as courts in Arizona and Delaware, have expressly recognized that the definition of an unlawful action under the respective consumer fraud

---

1. *Limbrecht* dealt with Iowa Code section 713.-24(2)(a) (1972). This statutory language is now located at Iowa Code section 714.16(2)(a).

acts expanded the consumer's rights beyond the common-law action for fraud. In these states, a violation of the Consumer Fraud Act does not involve the same elements as a common-law action for fraud. *See People ex rel. Babbitt v. Green Acres Trust*, 127 Ariz. 160, 168, 618 P.2d 1086, 1094 (App.1980); *In re Brandywine Volkswagen, Ltd.*, 306 A.2d 24, 29 (Del.Super.), *aff'd sub nom., Brandywine Volkswagen, Ltd. v. State*, 312 A.2d 632 (Del.1973); *Duhl v. Nash Realty, Inc.*, 102 Ill.App.3d 483, 495, 57 Ill.Dec. 904, 913, 429 N.E.2d 1267, 1277 (1981). In Arizona, reliance or actual deception or damage is not a prerequisite to a consumer fraud action brought by the attorney general. *See Green Acres Trust*, 127 Ariz. at 167, 618 P.2d at 1094.

■ We conclude the Iowa Consumer Fraud Act was not merely a codification of common-law fraud. The Consumer Fraud Act provides broader protection to the citizens of Iowa by eliminating common-law fraud elements of reliance and damages. To maintain an action for either injunction or restoration under the Consumer Fraud Act, it is necessary to show a misrepresentation of any material fact with the intent that others rely on this misrepresentation. To the extent that the discussion in *State ex rel. Turner v. Limbrecht*, 246 N.W.2d 330, 333 (Iowa 1976), can be interpreted to be inconsistent with this holding, it is overruled.

## V. *Evidentiary Findings.*

■ In order to determine if there has been a material misrepresentation, we have considered the following factors: (1) the product involved; (2) the type of claim; (3) the benefits of a truthful claim; (4) the ease of developing substantiation for the claim; (5) the consequences of a false claim; and (6) the amount of substantiation experts in the field would agree is reasonable. *See In re Thompson Medical Co.*, 104 F.T.C. 648, 821 (1984), *aff'd, Thompson Medical Co. v. FTC*, 791 F.2d 189 (D.C.Cir. 1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

Based on the scientific evidence in this record, we conclude that the electromag-

netic treatment of water is a speculative area which is, at best, in an embryonic stage of future development. Van Gorp designed, manufactured, and marketed the Hydro–Mag devices with no related scientific expertise. He made several very specific claims promising immediate results including; softer water, clean pipes, "better health," and "sparkling dishes." These wide ranging claims were based solely on Van Gorp's personal opinions and speculation. None of these advertising claims were substantiated by scientific testing. Van Gorp misrepresented the extremely experimental nature of the electromagnetic treatment of water. These misrepresentations were made with the intention that purchasers would rely on them.

Van Gorp argues that the tests conducted by Dr. Baumann were incomplete and therefore inconclusive. Van Gorp cites the case of *Evis Manufacturing Co. v. FTC*, 287 F.2d 831, 838–39 (9th Cir.), *cert. denied*, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 28 (1961). In *Evis*, the Federal Trade Commission brought an action claiming that the marketing of a water conditioner was misleading. The Ninth Circuit would not rely on the tests of experts because "they did not know the theory upon which the device purportedly worked; they did not know the composition of the metal; and they were not acquainted with the claimed special processing thereof. In performing their experiments, they did not follow instructions of operation which, according to evidence adduced by the company, was important to achieve desired results." *In re Warner Lambert Co.*, 86 F.T.C. 1398, 1462 (1975) (discussing *Evis* ), *aff'd as modified, Warner–Lambert Co. v. FTC*, 562 F.2d 749 (D.C.Cir.1977), *cert. denied*, 435 U.S. 950, 98 S.Ct. 1575, 1576, 55 L.Ed.2d 800 (1978).

Dr. Baumann's procedures do not approach the type of testing conducted in *Evis*. Dr. Baumann requested Van Gorp to set out his claims in writing. This writing served as a basis for Dr. Baumann's experiments. Van Gorp's expert, Dr. Cole, testified that Dr. Baumann's experiments "were well constructed, well conducted and

well intended ... I have no objection to them whatsoever."

Because Dr. Baumann was retained by a major manufacturer of water softeners, Van Gorp asserts that his testimony was unreliable. Dr. Baumann's testimony is substantiated by other evidence, including that of Dr. Cole, Mr. Van Gorp's witness. We find Dr. Baumann's testimony is credible and reliable.

█ We also find Mr. Van Gorp's lay witnesses to be unpersuasive. Each of these customers testified as to their beliefs concerning Hydro–Mag, however, none were able to say with any degree of confidence that the Hydro–Mag, and not any other changes, caused the improvement. Also, establishing that there were satisfied customers is not a complete defense to this type of action. *See, e.g., In re Warner Lambert Co.*, 86 F.T.C. 1398, 1462 (1975).

Finally, Van Gorp claims that an unfavorable ruling will have a chilling effect on legitimate scientists and inventors. We respect the experimental nature of scientific evolution. We understand that many of today's ideas will eventually develop into tomorrow's realities. The necessity for experimentation does not, however, provide justification for marketing products without the proper support for claims made to the public. In this case, Van Gorp made several very specific and unqualified claims to the public which had no scientific support. Van Gorp's advertisements gave no hint of the speculative nature of electromagnetic effects on water. We find that the State has established the necessary elements of consumer fraud under Iowa Code section 714.16 by a preponderance of clear, convincing and substantial evidence.

## VI. *Effect of Small Claims Ruling.*

█ The district court ruled that Guy Gabriel was not entitled to statutory restoration because he had previously brought an action in small claims against Van Gorp. Gabriel sought the return of purchase money from Van Gorp. Gabriel's case was dismissed from small claims court for lack of evidence.

Neither issue nor claim preclusion applies to this case. The small claims action was not brought under section 714.16 and was brought by Gabriel, not the State of Iowa. Because of the informal nature of small claims court, we cannot precisely determine under what theory the action was decided, although we assume it was a breach of warranty theory. This case falls squarely within *Village Supply Co. v. Iowa Fund, Inc.*, 312 N.W.2d 551, 554 (Iowa 1981). In *Village Supply*, we held that an adjudication in small claims court did not have a preclusive effect on a subsequent suit in district court. *Id.* We find Gabriel is entitled to restoration of monies in accordance with Iowa Code section .714.16.

## VII. *Disposition.*

We affirm the order of the district court which permanently enjoined Hydro Mag, Ltd. and Donald Van Gorp from making certain claims and representations in connection with the sale or attempted sale of any Hydro–Mag unit or similar water treatment device. We also affirm the district court's order which held Hydro Mag, Ltd. and Donald Van Gorp jointly and severably liable to the State of Iowa for restoration of monies on behalf of four consumers. In addition, on cross appeal, we find Hydro Mag, Ltd. and Donald Van Gorp jointly and severably obligated to make restitution to the State of Iowa on behalf of Guy Gabriel in the amount of $747.00.

The district court order taxing the costs of this action against Hydro Mag, Ltd. and Donald Van Gorp is affirmed and extended to include the costs of this appeal.

AFFIRMED AS MODIFIED.