Mark GANNON and Arlen Nichols, Appellants,

v.

BOARD OF REGENTS of the State of Iowa; Gregory S. Nichols, Executive Director, Board of Regents of the State of Iowa; Iowa State University Foundation; Peg Armstrong–Gustafson, Interim President and Chief Executive Officer, Iowa State University Foundation, Appellees.

No. 03–1658.

Supreme Court of Iowa.

Feb. 4, 2005.

Thomas D. Hanson of Hanson, Bjork & Russell, L.L.P., Des Moines, for appellants.

Mark McCormick and Christopher M. Miller of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, for appel-

lees Iowa State University Foundation and Armstrong–Gustafson.

George A. Carroll, Assistant Attorney General, for appellees Board of Regents and Nichols.

STREIT, Justice.

In this appeal, we are asked to decide whether a government body may outsource one of its core functions to a private corporation, making that part of its operation nongovernmental and not subject to public scrutiny. We hold the Iowa State University Foundation, a recipient of such outsourcing, is performing a government function, and therefore its records are subject to disclosure. Because the district court found the Foundation was not performing a government function and in doing so granted the Foundation's motion for summary judgment, we reverse and remand for a trial on the merits.

## I. Facts and Prior Proceedings

The present dispute concerns the access the public has to the records of the Iowa State University Foundation under the Iowa Freedom of Information Act. The petitioners, Mark Gannon and Arlen Nichols, are citizens and taxpayers of Iowa who want to open up the Foundation's records for the public to see.

## A. Events Leading to Lawsuit

In November 2001, the petitioners wrote the Iowa Board of Regents

request[ing] access to all the financial records of the [Foundation [1]] ..., showing all [its] receipts and disbursements ... from 1990 to the present, together with access to correspondence, memoranda, meeting minutes, directors minutes, reports and the like explanatory of such transactions.

In the event this request was denied, the petitioners asked the Board to tell them the reason for doing so and the Board's administrative appeal procedure, if any.

The Board of Regents refused the petitioners' requests. The Board told the petitioners the Foundation was a private corporation it did not create or oversee. Although the petitioners and the Board exchanged further correspondence, the Board refused the bulk of the petitioners' requests.

In May 2002, the petitioners wrote a letter to the executive director of the ISU Foundation requesting to inspect a substantial amount of the Foundation's records.[2] The petitioners did not want to see

---

1. The petitioners also asked the Board of Regents to provide the same information with respect to the Iowa State University Agricultural Foundation and the University of Iowa Foundation. Because these other foundations are not parties to this appeal, we omit all further reference to them.

2. The alleged public records spanned from 1995 to 2002 and included: (1) the Foundation's tax returns; (2) its audited financial statements; (3) reports of activities the Foundation submitted to the Board; (4) its chart of accounts; (5) unaudited trial balances; (6) a "register containing the abstract of investments of endowment and non-endowment funds committed to the Foundation's custody by the Board of Regents or its delegees"; (7)

"documentation relating to the acceptance and administration of trusts submitted to the Foundation by the Board"; (8) "documents showing distributions of funds to [ISU] or its affiliates, including ... documents showing the source of the funds and the restrictions on their use and disposition"; (9) "[a] listing of all contributions to the ... Foundation in excess of $25,000 from corporations, [individuals, or the estates of individuals] ..., together with documentation of any restrictions on the contributions or considerations provided to the contributor"; (10) a list of all perquisites provided to ISU employees paid for with Foundation funds; (11) minutes of all meetings of the Foundation's Board of Directors and Board of Governors, "including reports

any confidential records.[3] *See* Iowa Code § 22.7 (2001) (listing various exceptions to general rule of disclosure of public records). The Foundation replied that the petitioners' requested date for inspection was not acceptable, mailed the petitioners a copy of its tax returns for the previous three fiscal years, and stated it was considering the petitioners' request and would respond as soon as possible. Although the Foundation provided a limited amount of the requested information in the ensuing weeks, it did not seek an injunction to restrain the petitioners' examination of the materials it did not provide. *See id.* § 22.8.

### B. The Lawsuit

In August 2002, the petitioners filed a petition for a writ of mandamus in the district court pursuant to the Iowa Freedom of Information Act against the Board of Regents, the Foundation, and two of their executive officers. *See id.* § 22.5. The petitioners alleged the Foundation possessed "public records" it had refused to disclose. They presented two theories. First, the petitioners claimed the Foundation was a "government body" and its records were public records subject to disclosure. In the alternative, the petitioners argued the Foundation was at the very least a "fiduciary" or "other third party" with records relating to the investment of public funds in its custody. The petitioners asked the court to issue a writ of mandamus directing the respondents to produce the requested records, an injunction to prevent further violations of the Act, statutory damages, and attorney fees. *See id.* § 22.10 (civil enforcement).

... containing budgets, identification of uses of funds derived from Foundation funds for [ISU] projects and activities and investment results"; and (12) "[a]ll correspondence ... relating to the use of funds controlled by the ISU Foundation."

### C. Discovery

During discovery, the petitioners learned the following about the Foundation and its predecessors:

#### 1. The Iowa State College Foundation

In 1958, the Iowa Board of Regents granted Iowa State College (now Iowa State University) President James Hilton the authority to establish the "Iowa State College Foundation." The ISCF was duly incorporated as a private not-for-profit corporation. The ISCF's articles of incorporation stated its purpose was "to accept, hold, administer, invest and disperse for educational and scientific purposes" funds "to educational and scientific institutions." Upon dissolution, all corporate assets were to become the property of the State of Iowa on the condition they be held "for the perpetual use of [the College]." The ISCF's Board of Directors was divided into four classes. The first class consisted of the President of the College and the President of the Board of Regents.

#### 2. The Iowa State University Achievement Foundation

In 1980, an entity then known as the "Iowa State University Foundation" and the Iowa State University Alumni Association incorporated the "Iowa State University Achievement Foundation." The stated objects and purposes of the ISUAF were to promote the welfare of ISU faculty, students, and alumni and "[t]o accept, hold, administer, invest, and disperse for educational and scientific purposes gifts,

3. The district court did not decide whether any of the Foundation's records were confidential. Nothing in this opinion should be construed as a ruling on this issue.

grants, bequests, and devises ... exclusively for the benefit of [ISU] and its students." Upon dissolution of the ISUAF, its assets were to be transferred to an organization whose objects and purposes were the same as its own or directly to the State of Iowa "for the exclusive use and benefit of [ISU]."

### 3. The Iowa State University Foundation

#### (a) Corporate Structure

In 1988, the ISUAF changed its name to the "Iowa State University Foundation," the same moniker as one of its incorporators. At the time of the filing of this action, the Foundation operated under its "Third Amended and Restated Articles of Incorporation." As stated in the Articles, the object of the Foundation is to promote the welfare of ISU faculty, students, and alumni and to identify, cultivate, and solicit donors for the exclusive benefit of ISU. The Foundation will "accept, hold, administer, invest, and disperse for educational and scientific purposes gifts, grants, bequests, and devises ... exclusively for the benefit of [ISU]." Upon dissolution, the Foundation's assets are to be transferred to an organization whose objects and purposes are the same as its own or directly to the State of Iowa for the exclusive benefit of ISU.

Like the ISCF before it, the Foundation's Board of Directors is divided into four classes. The first class consists of three members. One member is required to be the President of ISU. In addition to the designated seat of the President, two other members of the Foundation's Board happen to be affiliated with ISU or the Board of Regents.

The Board of Directors is responsible for deciding whether to accept or reject gifts to the Foundation. The Board of Directors has delegated this responsibility to a Gift Acceptance Committee in accordance with a gift acceptance policy. One member of the Committee is an ISU faculty representative chosen in consultation with the ISU Faculty Senate. The policy gives guidance to Foundation employees regarding the acceptance of prospective gifts. For example, the Foundation requires gifts of "significant risk" (e.g., gifts of real property) be documented with a "written understanding" between the donor, the Foundation, and ISU before the Foundation will accept them.

#### (b) The Service Agreement

Historically the Foundation was staffed with ISU employees and located on the ISU campus. In October 2001, however, the Board of Regents Office recommended the Board of Regents approve an agreement between ISU and the Foundation. The Board Office noted that pursuant to this agreement ISU would "lease" its employees to the Foundation until the Foundation could arrange its own financial compensation package for them.

On August 21, 2002, ISU and the Foundation executed (or renewed) an elaborate "service agreement." According to the agreement, ISU

desire[d] to engage the expertise of the Foundation to provide advice, coordination, and assistance in the fundraising and development area, and in the operation, accounting and fund investment management thereof, and the Foundation desire[d] to provide such services, not as an employee or agent of the University, but as an independent contractor.

The service agreement does not specify how much ISU must compensate the Foundation for its services. In 2002, ISU agreed to pay the Foundation $750,000 annually.

The Foundation presently employs its own personnel—85 full-time employees and 150 part-time employees. In 2001, the Foundation also purchased a facility off-campus for its headquarters with ISU Foundation funds. Today the ISU Foundation styles itself not as a part of ISU but rather as a wholly independent and private not-for-profit corporation organized to raise and manage private gift support for the exclusive benefit of ISU. The Foundation conducts a variety of comprehensive fundraising-related services for ISU, including telemarketing, direct mail, coordinated capital campaigns, donor solicitation and identification, investment and securities management, database management, gift receipting, estate planning and structuring, and planned giving consultation regarding the tax implications of wills, trusts, and life insurance.

The Foundation manages two types of funds for ISU. The first category consists of funds donated to ISU that ISU then transfers to the Foundation. The service agreement requires the Foundation, "as [ISU's] agent," to separately account for such funds and hold them in accordance with the donor's intent and at the direction of ISU "with the same care applicable to fiduciaries of charitable trust funds." The second category consists of funds donated directly to the Foundation "in trust" for the benefit of ISU. The Foundation invests both types of funds in accordance with an investment policy. As of 2002, it appears the Foundation retained $234 million in private endowment funds. In 2001–02, the Foundation provided $38.9 million in "expendable contributions and endowment earnings to [ISU] as specified by donors to support university programs, scholarships, facilities, and projects."

The agreement contemplates that the parties will coordinate with all "University support organizations" and meet annually to "plan future activities." The President of the Foundation is required each year to give reports to ISU detailing past and contemplated activities performed on ISU's behalf. ISU faculty, staff, and administrators develop lists of fundraising and spending projects for the Foundation; after the Foundation responds to ISU "about the fundraising feasibility of the projects, [ISU] adopts the fundraising priorities." The Foundation is also obligated to provide ISU's President with an annual independent audit report and a copy of its tax return. ISU also has the right to audit the Foundation once a year for all "accounts and records relating to property donated in the name of the ISU, but held and managed by [the] Foundation."

The service agreement requires that ISU's President remain a voting member of the Foundation's Board of Directors and a member of its Executive Committee. It also grants the Foundation access to ISU's "telephone systems, computation systems, printing, stores, ... professional support and services generally available to University departments," "access to [ISU's] Human Resources Services and benefit programs," space for its telemarketing programs, and "other services available to [ISU] units and departments." Foundation employees are provided identification cards, parking privileges, admission to athletic events, access to the ISU library, and staff recreation and fitness programs on the same terms as ISU employees. The Foundation is also permitted to use the ISU name, logo, and website. In addition, the Foundation has access to private data files on graduates, students, employees, and retirees of the university. For example, the Foundation can know a particular individual's demographic information and degree, as well as whether he or she received a scholarship.

## D. Dismissal in the District Court

Faced with this record, the district court granted the defendants' motion for summary judgment. First, the court held the Foundation was not a "government body" as contemplated in the Iowa Freedom of Information Act, and therefore its records were not public records. The court concluded the Foundation's history, purpose, activities, and close ties to ISU did not make it a government body. Second, the court reasoned that funds donated directly to the Foundation in trust for ISU are Foundation funds and thus records relating to these private funds are not a matter of public record until they are dispersed to ISU. Although the court recognized that records relating to funds that ISU deposited with the Foundation as its agent were public funds and hence a matter of public record, the court declined to issue a writ of mandamus because the petitioners did not ask ISU for the documents. As a corollary matter, the court also ruled it was not a function of ISU to solicit and manage private donations and for this reason concluded ISU "did not abdicate any of its functions to the Foundation in order to 'prevent the examination of records or copying of a public record' in violation of Iowa Code [section 22.2(2)]." The petitioners appealed.

## II. Scope and Standards of Review

■ "Customarily our review of an action brought under chapter 22 would be de novo, the nature of the action being that of mandamus, triable in equity." *KMEG Television, Inc. v. Iowa State Bd. of Regents,* 440 N.W.2d 382, 384 (Iowa 1989); *see also* Iowa Code §§ 22.5, .10, 661.3. Because this matter is before us on an appeal from an entry of summary judgment, however, de novo review is not permitted. *See KMEG,* 440 N.W.2d at 384.

"[W]e cannot find facts de novo in an appeal from summary judgment. The proper scope of review of a case in equity resulting in summary judgment is for correction of errors of law."

*Coralville Hotel Assocs., L.C. v. City of Coralville,* 684 N.W.2d 245, 247 (Iowa 2004) (quoting *Koenigs v. Mitchell County Bd. of Supervisors,* 659 N.W.2d 589, 592 (Iowa 2003)).

Summary judgment principles are well settled. As we recently stated in *Smith v. Shagnasty's Inc.,*

> Summary judgment is proper only if the record made shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. We view the record in the light most favorable to the resisting party, affording that party all reasonable inferences that the record will bear. In sum, we indulge in every legitimate inference that the evidence will bear in an effort to ascertain the existence of a fact question. An inference is legitimate if it is rational, reasonable, and otherwise permissible under the governing substantive law. On the other hand, an inference is not legitimate if it is based upon speculation or conjecture.
>
> The burden of showing the nonexistence of a fact question rests with the moving party. If reasonable minds may differ on the resolution of an issue, a genuine issue of material fact exists.

688 N.W.2d 67, 71 (Iowa 2004) (citations and internal quotations omitted).

## III. The Merits: The Iowa Freedom of Information Act

### A. General Principles

■ Thomas Jefferson is said to have remarked that an informed citizenry is the bulwark of a democracy. Iowa Code chapter 22, Iowa's Freedom of Information Act,

is designed "to open the doors of government to public scrutiny." *Iowa Civil Rights Comm'n v. City of Des Moines*, 313 N.W.2d 491, 495 (Iowa 1981). The Act seeks "to prevent government from secreting its decision-making activities from the public, on whose behalf it is its duty to act." *Id.*

Subject to some limitations not relevant here, everyone has the right to examine, copy, and disseminate "public records." *See* Iowa Code § 22.2(1). Thus, to determine whether the public has inspection rights under the Iowa Freedom of Information Act, we must begin with the statutory definition of "public records." *See Howard v. Des Moines Register & Tribune Co.*, 283 N.W.2d 289, 299 (Iowa 1979). The Act defines "public records" as:

> all records, documents, tape, or other information, stored or preserved in any medium, of or belonging to this state or any county, city, township, school corporation, political subdivision, nonprofit corporation other than a county or district fair or agricultural society, whose facilities or indebtedness are supported in whole or in part with property tax revenue and which is licensed to conduct pari-mutuel wagering pursuant to chapter 99D, or tax-supported district in this state, or any branch, department, board, bureau, commission, council, or committee of any of the foregoing.
>
> *"Public records"* also includes all records relating to the investment of public funds including but not limited to investment policies, instructions, trading orders, or contracts, whether in the custody of the public body responsible for the public funds or a fiduciary or other third party.

Iowa Code § 22.1(3).

■ "The right of persons to view public records is to be interpreted liberally to provide broad public access to public records." *Rathmann v. Bd. of Dirs. of the Davenport Cmty. Sch. Dist.*, 580 N.W.2d 773, 777 (Iowa 1998). Exceptions to the general rules of disclosure are to be narrowly construed. *Id.* In addition, "[a] government body shall not prevent the examination or copying of a public record by contracting with a nongovernment body to perform any of its duties or functions." Iowa Code § 22.2(2).

## B. The Merits

■ Ours is not the first appellate court presented with the question of whether a nominally private foundation with close ties to a university is subject to a state freedom of information act. *See, e.g., Cal. State Univ., Fresno Ass'n, Inc. v. Superior Ct.*, 90 Cal.App.4th 810, 108 Cal.Rptr.2d 870 (2001); *State Bd. of Accounts v. Ind. Univ. Found.*, 647 N.E.2d 342 (Ind.Ct. App.1995); *Frankfort Publ'g Co. v. Ky. State Univ. Found., Inc.*, 834 S.W.2d 681 (Ky.1992); *State ex rel. Guste v. Nicholls Coll. Found.*, 564 So.2d 682 (La.1990); *Jackson v. E. Mich. Univ. Found.*, 215 Mich.App. 240, 544 N.W.2d 737 (1996); *State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.*, 65 Ohio St.3d 258, 602 N.E.2d 1159 (1992); *4-H Road Comm'n v. W. Va. Univ. Found.*, 182 W.Va. 434, 388 S.E.2d 308 (1989). Perhaps because of the differing statutory schemes involved and the fact-intensive nature of open-records challenges a consensus has not emerged in these courts on how best to approach such matters. *See* Salin G. Geevarghese, *Looking Behind the Foundation Veil: University Foundations and Open Records Laws*, 25 J.L. & Educ. 219, 230 (1996) [hereinafter "Geevarghese"]. The gist of the petitioners' first claim in this case is that the ISU Foundation's function, history, purpose, activities, and close ties to ISU render it a government body, i.e., a branch, department, or other entity of the

state, notwithstanding its formal status as a private not-for-profit corporation and recent moves to distance itself from ISU. In the alternative, the petitioners argue the Foundation possesses public records insofar as it retains records relating to the investment of public funds. We do not reach either of these issues. We agree with the petitioners that the Foundation is performing a government function, and therefore, contrary to the district court, we hold the Foundation's records are subject to public disclosure. The Foundation is plainly performing a government function by virtue of its contract with ISU, and therefore section 22.2(2) of the Iowa Freedom of Information Act mandates disclosure. A government body may not outsource one or more of its functions to a private corporation and thereby secret its doings from the public.

### Iowa Code § 22.2(2): Government Bodies, Their Contracts, and Public Disclosure

The petitioners have steadfastly maintained that the solicitation and management of private funds for a public university is a government function. The petitioners have also pointed out that the Iowa Freedom of Information Act expressly provides:

> A government body shall not prevent the examination or copying of a public record by contracting with a nongovernment body to perform any of its duties or functions.

Iowa Code § 22.2(2). The district court held Iowa Code section 22.2(2) did not apply to the present dispute, however, because (1) the functions of ISU are well defined by statute and do not include the solicitation or the management of private gifts and (2) ISU "did not abdicate any of its functions to the Foundation in order to 'prevent the examination or copying of a public record.'" Because we find the Foundation is performing a government function pursuant to its contract with ISU, we reverse and hold that the Foundation's records must be disclosed.

In ruling the Foundation was not performing a government function, the district court relied upon *KMEG Television, Inc. v. Iowa State Board of Regents*, 440 N.W.2d 382 (Iowa 1989). In *KMEG*, the University of Iowa sold rights to broadcast Hawkeye athletic events to a communications management firm for a fixed sum. 440 N.W.2d at 383–84. The contract between the university and the firm was openly bid, constituted a public record, and was fully disclosed. *Id.* at 385.

The firm later solicited proposals from television stations to determine which local broadcasters would have the right to televise Hawkeye football and basketball games in individual markets. *Id.* at 384. KMEG, a television station, lost out on one of these bidding competitions. *Id.* Disappointed, KMEG requested the university and the firm disclose all documents relating to this secondary bid, i.e., the firm's resale of a portion of the Hawkeye broadcasting rights it owned. *Id.* When the university and the firm refused, KMEG brought suit under chapter 22. *Id.*

In *KMEG*, we first considered whether the firm's records regarding the secondary bidding process belonged to the university. We held they did not. *Id.* at 385. We noted that "[s]imply because a government agency contracts with a private corporation, the affairs of the corporation do not become the affairs of the government." *Id.* We pointed out the records sought were never in the possession of, or shared with, the university. *Id.* Nor had the university indicated any interest in having the records or reviewing them. *Id.* Indeed, all revenues from the bidding process benefited the firm, not the university; as we

expressly noted in *KMEG*, the university's interests dissipated once the firm paid for the broadcasting rights, which it then in turn resold. *See id.*

We then examined the import of Iowa Code section 22.2(2). *Id.* We wrote:

> Closely linked with KMEG's ... argument is its contention that Iowa Code section 22.2(2) precludes the sort of record concealment complained of here.... When read in harmony with preceding subsection 22.2(1) (authorizing the right of "[e]very person ... to examine and copy public records"), we think the statute conveys an obvious legislative intent to prevent government agencies from accomplishing indirectly what they are prevented from doing directly. *In other words, a government body may not delegate or "contract away" its duties or functions in order to avoid disclosure of what would otherwise be a public record.*

*Id.* (emphasis added). We concluded, however, that the firm's "marketing and production of intercollegiate sports television broadcasts" was not a duty or function of government. *Id.* at 386. We held this activity simply was "not one reasonably embraced by the statutory duty of the University." *Id.; see also* Iowa Code § 263.1 (the statutory "object" of the University of Iowa is "to provide the best and most efficient means of imparting to men and women ... a liberal education and thorough knowledge of the different branches of literature and the arts and sciences, with their varied applications"). Nor was it "a function capable of performance by the school." *Id.* In *KMEG*, a private firm simply sold what it had bought from a government body, and the government body retained no control or interest in the subject matter of the resale.

From our discussion in *KMEG*, the district court here ruled the solicitation and management of private donations was not a duty or function of ISU. The district court cited a federal statute that indicates the "leading object" of ISU, as a federal land-grant institution, is "to teach such branches of learning as are related to agriculture and the mechanic arts." 7 U.S.C. § 304 (2000). It also referenced a state statute that requires ISU to adopt and teach

> practical courses of study, embracing in their leading branches such as relate to agricultural and mechanical arts, mines and mining, and ceramics, and such other branches as are best calculated to educate thoroughly the agricultural and industrial classes in the several pursuits and professions of life, including military tactics.

Iowa Code § 266.2. Finding these statutes defined ISU's duties and functions and did not include the solicitation and management of private donations, the court held Iowa Code section 22.2(2) did not mandate disclosure of the Foundation's records.

We reject such a narrow and archaic interpretation of the function of a university. It is based on an overly restrictive reading of our *KMEG* decision. This court did not state in *KMEG* that a university's functions are limited to those set out in statutory grants of authority. To the contrary the operation of an intercollegiate athletic program was a "governmental power," not because the university had specific statutory authorization for such an activity, but because athletics "*advance[d]* its statutory objects." *KMEG*, 440 N.W.2d at 386 (emphasis added). An activity need not be listed in the statute books to be a function of a university. To qualify, the activity at issue need only advance the statutory objects of the institution. We think the activities of the Foundation unmistakably advance the institutional goals of ISU.

Successful fundraising and management is a very important, if not vital, function of the modern university and an integral part of its continuing viability. The Foundation's activities support a myriad of university programs, scholarships, facilities, and projects. "The receipt and solicitation of gifts ... is an indispensable function of any institution of higher learning." *Toledo*, 602 N.E.2d at 1162.[4] "[T]he solicitation and receipt of donations for the university, and keeping records of that activity, are government functions." *Id.* at 1163; *accord Boston v. Tanner*, 29 F.Supp.2d 743, 747 (W.D.La.1998) (approving view that the power to "seek and accept donations ... relate[s] strictly to [a] university's academic function"). The legislature recognized this fact (and to some extent made fundraising a duty of the Board of Regents) when it required the Board of Regents to "[a]ccept and administer trusts" and permitted it to "authorize nonprofit foundations acting solely for the support of institutions governed by the [B]oard to accept and administer trusts deemed by the [B]oard to be beneficial." Iowa Code § 262.8. Although the record does not tell us the precise share of support for university programs, scholarships, facilities, and other necessary university expenses paid by the Foundation, if ISU stopped its fundraising efforts or quit participating in the Foundation's efforts, ISU students and the legislature would certainly be surprised to learn that such activity was not a government function. The uncontroverted evidence shows that today's Foundation continues the essential purpose of its predecessor foundations and by virtue of this fact enjoys the continued support of ISU.[5] ISU now per-

---

**4.** This conclusion was not merely hortatory language on the part of the Ohio Supreme Court; it was, given the language of the Ohio Freedom of Information Act, central to that court's holding that the records of the University of Toledo Foundation were subject to public disclosure. *See* Ohio Rev.Code Ann. § 149.011(A) (2003) (defining a "public office" as "any state agency, public institution, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government"). Applying the Ohio law to facts nearly identical to those presented here, the Ohio Supreme Court concluded the University of Toledo Foundation was a "public office" and its records subject to disclosure. After concluding the University of Toledo Foundation's predecessor foundations plainly "operated essentially as gift-receiving and soliciting arms of the university, despite their status as private, nonprofit corporations," the court remarked that

> [g]iven the relatively recent merger of the [predecessor entities] to create the present entity, the continuation of the essential mission of the predecessors, and the continued support of the university, the foundation cannot be viewed in legal isolation from those entities from which it came.

*Toledo*, 602 N.E.2d at 1162. Critically, the Ohio court pointed out the University of Toledo Foundation was—as its statute required—performing a government function, insofar as it received and solicited gifts on the university's behalf. *Id.* For these reasons, the court concluded the Toledo Foundation was a public office because it was "not a mere supplementary benefactor of the university" but rather "a major gift-receiving and soliciting entity of the university." *Id.*

**5.** The Foundation vigorously denies any connection to the Iowa State College Foundation, an entity created with the blessing of the state. The record, on the other hand, contains an internal Board of Regents memorandum that indicates the Foundation was created in 1958, the year the ISCF was incorporated, not 1980. One of the Foundation's incorporators was also named the "Iowa State University Foundation." Given the well known fact that ISU was known as Iowa State College in 1958, *see State v. Proulx*, 252 N.W.2d 426, 431 (Iowa 1977) (court may take judicial notice of "facts capable of accurate and ready determination by resort to sources of indisputable accuracy") (citing Charles T. McCormick, *Handbook of the Law of Evidence* § 328 (2d ed.1972)), it would not be unreasonable to conclude that this incor-

mits—if not actively directs—money that would naturally flow to the government to migrate to the Foundation. Before the Foundation existed, people wanting to donate to ISU presumably did so directly; now they must choose between ISU and the Foundation, with ISU at the very least allowing that such interests be directed to the Foundation.[6] In executing the service agreement, ISU, a government body, with the express approval of another government body, the Board of Regents, has "contracted away" one · of its functions—the ability to raise money and manage its finances—to what we assume in this case is a nongovernment body. In so doing, the Board and ISU have "accomplish[ed] indirectly what they are prevented from doing directly," i.e., they have "avoid[ed] disclosure of what would otherwise be a public record." *KMEG*, 440 N.W.2d at 385. The Iowa Freedom of Information Act expressly prevents this result, and therefore the Foundation's records remain subject to disclosure even if it is no longer a government body. Iowa Code § 22.2(2).

■ We note that in interpreting section 22.2(2), the subjective intent of the government body outsourcing its duties or functions is not relevant to our analysis. We disavow any language in *KMEG* to the contrary. It is true *KMEG* opines that after one seeking disclosure establishes the delegation of a function or a duty, the burden should then shift to the government body to show "the delegation . . . was

not *for the purpose* of preventing the examination or copying of a public record." 440 N.W.2d at 385–86 (emphasis added). This part of our decision, in which we crafted a "two-step process" for "[e]stablishing a violation of section 22.2(2)" was strictly *obiter dicta*, however; our holding in that case was expressly limited to a finding that no function was in fact delegated. *Id.* at 385; *see id.* at 386 (stating that "we need not consider the second prong of the test to be applied under section 22.2(2)"); *see also Boyles · v. Cora*, 232 Iowa 822, 847, 6 N.W.2d 401, 413 (Iowa 1942) (defining *obiter dicta* as "passing expressions of the court, wholly unnecessary to the decision of the matters before the court"). On closer inspection of the statute in this case—a case where a ruling on the issue matters—we find · section 22.2(2) contains no such requirement. *Cf. State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 621 (Iowa 1989) ("That language was not . . . necessary to the holding and we will not use that language to determine the necessary elements in this case."). Unlike other statutes, Iowa Code section 22.2(2) does not contain language indicating a showing of intent to prevent disclosure on the part of the actor, in this case the government body, is required. *Cf.* Iowa Code §§ 703.3 ("with the intent to prevent"), 718.4 ("willfully prevents or attempts to prevent"), 719.3 ("with intent to prevent"). When intent to prevent disclosure of a public record is shown, the Code provides other remedies in addition to public scrutiny. *See, e.g., id.*

porating foundation and the ISCF were one and · the same entity. Notwithstanding the parties' efforts to persuade us one way or the other, however, resolving this factual dispute over the Foundation's DNA is not relevant to our disposition of the case.

**6.** *KMEG* appeared to hold that in order for an activity to be a function of government, there must be some showing that government is

capable of performing that activity. We do not find this fact determinative. In any event, while there is some testimony in the summary judgment record that ISU engaged the Foundation for its expertise in the competitive world of fundraising, it is not disputed that historically Foundation employees were ISU employees and ISU managed and raised its own funds.

§ 22.6 ("Any person knowingly violating or attempting to violate any provision of this chapter where no other penalty is provided shall be guilty of a simple misdemeanor.").

Our dicta in *KMEG* also conflicts with the liberal reading we are supposed to give the Iowa Freedom of Information Act. *See Rathmann,* 580 N.W.2d at 777 ("The right of persons to view public records is to be interpreted liberally to provide broad public access to public records."). As written, Iowa Code section 22.2(2) plainly extends the Act's reach to records held by private entities that perform government duties or functions. *See Little v. Va. Retirement Sys.,* 28 Va. Cir. 411, 426 n. 5 (Cir.Ct.1992) (recognizing Iowa Code section 22.2(2) addresses concerns of delegation of government authority "perhaps more directly" than the Virginia Freedom of Information Act), *aff'd in part and rev'd in part sub nom. RF & P Corp. v. Little,* 247 Va. 309, 440 S.E.2d 908 (1994); *accord* Alasdair Roberts, *Structural Pluralism and the Right to Information,* 51 U. Tor. L.J. 243, 244, 249–51, 251 n. 40 (2001) (noting governmental restructuring has undermined the effectiveness of many state freedom-of-information laws because "[a]s authority has shifted to quasi-governmental or private organizations, the ambit of the law has shrunk"; the author discusses Iowa's statute among those jurisdictions that may take a more expansive view of contractor obligations). This is not to say the Iowa Freedom of Information Act mandates disclosure whenever a private organization happens to perform a duty or function of a government body. Not every private entity performing an activity that may be characterized as a government function in theory must open its doors to public scrutiny. Cases must also be viewed in their factual context. Here there is an elaborate contractual arrangement between the government body and a private organization, through which the private organiza-tion and the government enjoy a highly interwoven and symbiotic relationship. The Foundation is performing a government function in both a theoretical and a factual sense.

A standard that focuses upon the intent of the government body in preventing disclosure of a public record is also unworkable and would result in unreasonable or absurd consequences. *See State v. Conner,* 292 N.W.2d 682, 686 (Iowa 1980). Such a standard is unworkable because it would require an inquiry into the murky world of the subjective intent of a government institution. It is unreasonable or absurd because it would mean the same record may or may not be subject to disclosure depending on the state of mind of the government body at the time of outsourcing, notwithstanding that the interest in disclosure is the same in both instances. *Cf. Kiesau v. Bantz,* 686 N.W.2d 164, 173 (Iowa 2004). Examination of each category of records facilitates scrutiny of the conduct of public officials and institutions. As the *Toledo* court recognized, "[t]here is . . . [a] significant public interest in knowing from whom donations come and how that relates to where the university, as a public institution, chooses to spend its money." 602 N.E.2d at 1163. To rule otherwise would "obscure the sometimes significant link between a gift and its eventual use." *Id.; see also* Geevarghese at 234 (listing potential abuses that may result). We must simply interpret the statute as written. The plain and unambiguous language of the statute states that a government body shall not prevent examination or copying of a public record *by contracting* with a nongovernment body; nefarious intent on the part of the government body need not be shown. We disavow our dicta in *KMEG* to the contrary.

In sum, we conclude a government body, ISU, with the approval of another govern-

ment body, the Board of Regents, has contracted with what we assume in this appeal is a nongovernment body, the Foundation, to perform a government function for and on behalf of ISU. Iowa Code section 22.2(2) therefore mandates disclosure, without regard to the government body's intent in so contracting.

## IV. Conclusion

Summary judgment was not proper. The Foundation performs a government function by virtue of its contract with ISU. Therefore, its records are "public records" subject to examination. We reverse and remand for further proceedings.

**REVERSED AND REMANDED.**